## GRANT *v.* LEDWIDGE.

### Opinion delivered July 7, 1913.

BILLS AND NOTES.—FRAUDULENT REPRESENTATIONS—INTENT—LIABILITY.—
Where appellee was induced to endorse the note of a corporation payable to appellant, upon representations of appellant, who was secretary of the corporation, as to the soundness of the condition of the corporation, which representations were false and untrue, where appellee relied upon the statements of appellant, and endorsed the note on the faith of the same, appellant can not recover from the appellee on the note, although the appellant at the time of making the statements, had no intention to mislead appellee, and had no dishonest motive.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

#### STATEMENT BY THE COURT.

Ledwidge and English were the owners of a certain mill plant near Pinnacle, Arkansas. They afterward agreed to let the appellant have an interest in the plant and to incorporate the business under the name of the English-Grant Lumber Company, entering into a contract on the 29th day of January, 1908, which recited that English and Ledwidge sold to appellant $25,000 par value, consisting of 1,000 shares at $25 per share of the capital stock of the English-Grant Lumber Company for the sum of $5,000 in cash, and that appellant had the option at the expiration of one year from the date of the contract to return to English and Ledwidge the stock and receive therefor the sum of $5,000, which he had paid, without interest. Appellant paid into the corporation the sum of $2,000 in cash and executed his note for the balance. English and Ledwidge contributed their shares of the capital stock in assets of the lumber company.

On the 8th day of May, 1908, the appellant and English and Ledwidge entered into the following contract:

"For a valuable consideration paid this day to J. B. Grant, party of the first part, by E. Y. English and Chris Ledwidge, parties of the second part, said party of the first part releases unto said parties of the second part all his right, title and interest in all the property, both

real and personal, accounts, judgments, debts, choses in action, and all monies now owing the English-Grant Lumber Company or which may become due said company at any future time; and also all the right, title and interest said party of the first part now has in the shares of said company, and rights he now has under said shares of said company.

"For and in consideration of the above, said E. Y. English and Chris Ledwidge, parties of the second part, agree to, and hereby do release said J. B. Grant, party of the first part, from any and all liability on any and all debts, accounts, notes, bonds, choses in action and judgments which the English-Grant Lumber Company now owe, or which may be contracted or entered into at any time in the future by said English-Grant Lumber Company."

There was a further provision that the parties of the second part should "assume all liability on the present and future accounts, and judgments of any kind whatsoever, and to release J. B. Grant absolutely from any and all liability on debts of any kind, for which he would be liable as a stockholder of said corporation."

There was a further provision that "the parties of the second part should defend all suits or actions which may be brought against said J. B. Grant as an officer or stockholder of said English-Grant Lumber Company, and "assume all indebtedness incurred on account of such suits, and to pay all judgments that are taken against him as an officer or stockholder of said company."

On the same day the English-Grant Lumber Company executed to J. B. Grant its promissory note for $2,000, which was endorsed by Chris Ledwidge and E. Y. English.

This suit was originally instituted in the circuit court, in the year 1909, against the English-Grant Lumber Company and Chris Ledwidge and E. Y. English. Later a receiver was appointed for the English-Grant Lumber Company and this cause was transferred to chancery. There, in an amended and substituted com-

plaint, the appellant sets out the note and contract sued on and asks for judgment for the amount of the note and also to recover the sum of $1,667.47, the amount of a judgment which the receiver of the English-Grant Lumber Company had recovered against appellant upon his unpaid subscription to the capital stock of said corporation, and also for the sum of $250 attorney's fee, which appellant had agreed to pay in the action against him by the receiver.

Appellant set up the contract and note as exhibits to his complaint. He alleged that English and Ledwidge had refused to defend the suit wherein appellant was sued for his unpaid subscription and refused to pay the judgment that had been rendered against him, thereby causing him to have to pay the sum of $250 for attorney's fees, and that he would be compelled to pay the sum of $1,667.47, the judgment that had been rendered against him in favor of the receiver.

The answer, among other things, admitted the execution of the note and contract set out in the complaint, but alleged that they were executed with the distinct understanding and agreement that the assets of the corporation were sufficient to pay all its outstanding obligations, and upon the statement by Grant that a number of bills had been paid which were not paid; that Grant had made certain statements that were not true, and that Ledwidge, relying upon these statements as to the condition of the corporation, signed said note and contract, and that the consideration for the execution of said note and contract had failed; that the English-Grant Lumber Company was placed in the hands of a receiver, and that on account thereof the defendant, Ledwidge, was compelled to pay several of the debts of the corporation out of his own personal funds.

The answer admitted the rendition of the judgment against Grant in favor of the receiver, but averred that the judgment had not been paid. The answer further alleged that the appellant, plaintiff below, was informed of the financial condition of the corporation, and that

he made misrepresentations as to its financial condition by which appellee Ledwidge was induced to execute the note and contract. The answer further denied that appellant Grant bought the stock with the understanding that it could be returned within one year, and denied that Grant tendered the return of the stock and demanded the return of the money, and denied that appellees agreed to return to Grant the money he paid for the capital stock in said corporation by note or otherwise.

The cause was heard upon the depositions of appellant and appellee, Ledwidge, and also upon their oral testimony taken before the court.

The testimony by both of the witnesses is somewhat voluminous, but we will mention in the opinion only such parts of it as we deem essential for the determination of the issues involved, omitting the testimony in detail.

The chancellor made a general finding in favor of the appellee, and dismissed appellant's complaint for want of equity, and this appeal has been duly prosecuted.

*H. E. Rouse, John P. Streepey* and *Edward B. Downie,* for appellant.

No fraud or misrepresentation on the part of appellant is shown in the testimony. In view of appellee's close connection with the company as president, director and manager of the financial end of the business, his accessibility to the books of the concern at all times, which he could examine whenever he saw fit, it is unbelievable that he could have been misled. But even if he had been misled, it was manifestly through his own neglect to advise himself of the facts, and he can not now complain. 89 Ark. 309-315; 13 Wallace, 379; 99 Ark. 438, 442.

As a director he is conclusively presumed to know the pecuniary condition of the company. 38 Ark. 17, 25.

Appellant's statement is undisputed that he did not make the statement himself, but only assisted English, for whose partial benefit it was being made, in making up the statement. There is no ground for rescission of a contract, without a conclusive showing that the person

who made the statement knew it was false, and made it with the intention to mislead. 97 Ark. 15.

The record will not sustain the proposition that there was a mutual mistake inducing the execution of the note and contract. It was contemplated at the time appellant went into the company that he should have the right to withdraw within one year, and the execution of the note and contract was only carrying out the initial intention of the parties. 89 Ark. 313; 71 Ark. 614; 83 Ark. 131, 133.

*Bradshaw, Rhoton & Helm,* for appellee.

It is immaterial what name is given to the declarations made by appellant, and the statement furnished by him to appellee, the facts are, as is shown by the proof, that they were not true. The chancellor's finding will be sustained unless clearly against the preponderance of the evidence. 89 Ark. 309.

The presumption as to appellee's knowledge of the financial condition of the company arising from his being a director in the corporation, would apply in the case of any representations he might make to any third person, but this case does not present such a situation. The means of information were not open to both parties alike, in this case. Appellant was secretary and paymaster of the corporation. He alone knew the debts that had been contracted, what debts had been paid, and whether or not there were sufficient funds in the bank to pay the outstanding checks. Moreover, appellee stated to appellant that he could not rely upon the books but must have a statement from appellant showing the financial condition of the company.

If appellant made the representations not knowing whether or not they were true, but asserted them to be true, he is just as liable as if he had made them fraudulently and with intent to mislead appellee. 97 Ark. 15; 99 Ark. 438; 82 Ark. 20; 100 Ark. 147; 47 Ark. 148.

WOOD, J., (after stating the facts). The appellant contends that the appellee, Ledwidge, is liable on the contract entered into on the 29th day of January, 1908, at the organization of the corporation, whereby it was

agreed between English and Ledwidge, parties of the first part, and J. B. Grant, party of the second part, "that the said Grant has the option at the expiration of one year from that date to return the stock in the English-Grant Lumber Company and receive therefor his said sum of $5,000 without interest."

Counsel argue that this is the contract upon which the note for $2,000 is based, and that no fraud or mistake induced its execution. No recovery can be had upon the contract of January 29, 1908, for the reason that under the terms of the contract itself appellant Grant had the option to retire one year from the date of that contract, and he could not therefore, before that time, demand of Ledwidge and English the return of the amount of money he had paid in under that contract, upon his offer to surrender the stock which he had received in the English-Grant Lumber Company.

There is no allegation and no proof that the contract of January 29, 1908, was entered into in fraud of appellant's rights, or that he was induced to enter into said contract upon fraudulent representations made by English and Ledwidge. Appellant does not seek to repudiate that contract and to rescind the same for fraud and to sue for a return of the money which he had paid into the English-Grant Lumber Company upon grounds that there had been a breach of said contract; but, on the contrary, he alleged that the contract was in existence and was the basis of the note and contract in suit. Counsel misapprehend the effect of the contract of January 29, 1908, which, as we have stated, permitted him to exercise his option to retire one year from the date of the contract, but not before that time. So the issue in this case is narrowed to whether or not the appellant has the right to recover upon the contract and note executed on May 8, 1908, as set up in his complaint.

Appellee defends on the ground that the note and contract were executed with the distinct understanding and agreement that the assets of the corporation were sufficient to pay all its outstanding obligations, and that

appellant, being informed of the financial condition of the corporation, had made misrepresentations as to its financial condition by which the appellee, Ledwidge, was induced to execute the note and contract.

Concerning the execution of this note and contract, the appellant testified substantially as follows: That he could not get along agreeably with English and Ledwidge and was to withdraw from the company under agreement. The company at that time had enough money in cash to pay him for his stock. Most of it was in notes and checks. "The notes of the Central Lumber Company," says appellant, "were to be turned over to me, and the Central Lumber Company owed the English-Grant Lumber Company $1,930 in notes and another $1,000 in cash. Chris Ledwidge was to negotiate for the money on the notes of the Central Lumber Company to pay me out. I never got the money. So they paid me that note in payment of my stock when I sold the stock to them. They gave me this note and I accepted it for fifteen days. Mr. Ledwidge said he would negotiate the note and pay me in cash for the stock. He didn't do it. Then he gave me that note, the one I am suing on. I don't remember that I made any statement to Chris Ledwidge or E. Y. English with reference to the financial condition of the English-Grant Lumber Company, because Mr. English was as familiar with the business as I was. I didn't tell them I had paid the debts of the company, and didn't tell them that there was any cash in the bank. I don't remember that I told English and Ledwidge that there was enough bills and accounts receivable to pay all the debts of the company. I won't swear to that, as I don't remember. Mr. Ledwidge knew about the business. He knew about the condition of the company. He knew through Mr. English, and sometimes he asked me about it and I gave him my knowledge. At the time I was transferring the stock Mr. English made out the statement, and he and Mr. English understood very thoroughly about it. I was with Mr. English when the statement was made. It was

presented by Mr. English. It was a statement of everything in connection with the business. It was a statement of the financial condition. I assisted Mr. English in making it up. I understood it was made up for the purpose of having this trade go through. As far as I know about it, the statement was all right, true, of course. I didn't tell Ledwidge that certain bills had been paid that had not been paid. I didn't tell him that certain checks had not been drawn on the account when as a matter of fact they had been drawn on the account of the corporation. I didn't tell Ledwidge anything with reference to the financial condition of the corporation which was not true. The note sued on here and the contract which went with it constituted our entire agreement. This instrument (referring to the statement) is a carbon copy of the original list of assets and liabilities of the English-Grant Lumber Company, which Mr. English and I prepared, and which Mr. English submitted. As far as I know, the statement attached to my deposition is true, as to the condition of the company on May 8, 1908. It was as near as I could get it. I was secretary and had charge of the books, accounts and papers of the company. I was active in the management of the affairs of the company. I understood that they were the assets and liabilities of the company on the statement Mr. English made out.''

Further along in his testimony he states: ''Ledwidge said he would be willing to give me back the $2,000 and let me out. I didn't say anything about the condition of the business. The statement here in evidence was not made to serve any purpose so far as my contract was concerned. It was simply taken off as a preliminary to find out how the books stood with respect to the condition of the company. I think we all thought it represented the condition of the company.''

Appellee testified substantially as follows: ''He (appellant) agreed to take a sixty-day note from English of the English-Grant Lumber Company. I told him 'if they can pay you in sixty days they can pay you in

fifteen or ten days.' He came back afterwards and had that note, and I said that if these statements that he had given me, the statements of the financial condition of the company and that he and English had checked up and gone over, were correct (he was secretary and knew all about the business) * * * I would endorse it. We both endorsed it, and then he got a contract from us that we would pay this, etc. In other words, if what had been given me were the facts in regard to the company I was to carry out the agreement that I made."

Again Ledwidge testifies: "That is the transaction; he sold it to the English-Grant Lumber Company and took an English-Grant Lumber Company paper for it, and I endorsed that paper upon the condition that he said the company was in. He said there was plenty there to pay everybody out, and really it looked like it was on the point of liquidation. That is what I hoped to do with it."

Again: "In order to get me to endorse the note Grant represented to me that the company was solvent and was in ample shape to pay all its debts and had plenty of assets to pay them with. It was his business to know the company's financial condition."

Again: "He (Grant) represented that there were sufficient assets of the English-Grant Lumber Company, consisting of notes and accounts, to more than pay all the liabilities of the company. He made a statement to me showing all the cash on hand, and that and the notes and accounts were sufficient to pay all of the debts of the company. I relied on the truth of his statements when I endorsed the note. I would not have done it otherwise. The statement was evidently not true."

Continuing his testimony, he says: "At the time I signed the note it was understood between Grant and myself that the assets of the company, exclusive of the mills and the timber and lands, were sufficient to pay all of the debts of the corporation, and that I would execute this short time paper so it could be paid out of the assets of the company. When Grant told me that the state-

ment he made contained all of the liabilities of the corporation, we owed for lumber something like $700, and owed the Peoples Savings Bank about $700. In other words, to make a long story short, his statement to me was not a correct statement of the condition of the company. I relied upon him for a correct statement. Upon investigation immediately afterward I found that he had omitted liabilities of the company in excess of $2,000. Mr. Grant was in active charge of the company. I had nothing whatever to do with the management of it.''

Appellee further testified that he told Grant as follows: ''If they (the corporation) can settle with you in sixty days they can settle with you sooner. We will just make it ten days and grind this thing right straight through. I want to look at the accounts and see if they are like you boys say they are, and if we can let Grant out and pay him off we will do it. We went over and looked at the books, and they said they were in this condition. I said 'I would like to get a statement to that effect. In the meantime make up your papers.' The next day, or whenever it was, I signed the note and the agreement, with this understanding, that there was plenty of money to pay all the debts and leave them in the clear, and we would be like we started. This was the agreement I had with him.''

It will be seen from the above that the testimony of the appellee, Ledwidge, is clear and unequivocal to the effect that he executed the note and contract upon the representations of appellant and with the understanding between them that the assets of the corporation were sufficient to pay all its debts.

The testimony of the appellant, on the other hand, to say the least of it, is confused and in places apparently contradictory. For instance, in his cross examination in his deposition, speaking of the financial statement, he says: ''I understood it was made for the purpose of having this trade go through.'' But, in his testimony given before the court, he states: ''The statement here in evidence was not made to serve any pur-

pose so far as my contract was concerned." There are other apparent inconsistencies and contradictions in the testimony of appellant, but it could serve no useful purpose to point these out in detail.

We are of the opinion that the chancery court was warranted in finding that the note was endorsed and the contract executed by the appellee upon representations made by the appellant and upon an understanding with him to the effect that the assets of the corporation in excess of its liabilities were sufficient at that time to pay the note in controversy, and upon the representation made by the appellant that the statement furnished appellee reflected the true financial condition of the corporation at the time the statement was made. This finding of the chancellor was certainly not against the clear preponderance of the testimony.

True, appellant testified that Ledwidge was thoroughly familiar with the books of the company and its business, and had access to the books, but his own testimony and the testimony of the appellee shows that appellant was in charge of the books as secretary of the company and that he was in the active management of the affairs of the company. The testimony of the appellee shows that he was unwilling to sign the note and contract until the financial statement of the corporation had been furnished him, and the testimony of the appellant shows that the financial statement was made for the purpose of "having the trade go through." Appellee testified that he relied upon appellant furnishing him a correct statement, and he relied on the truth of appellant's statement concerning the financial condition; would not have endorsed the note without it.

This is not a case for the application of the doctrine of a reformation of written instruments. Therefore, what is said in *McGuigan* v. *Gaines,* 71 Ark. 614, and *Cherry* v. *Brizzolara,* 89 Ark. 309, as to the character of the proof necessary for the reformation of written instruments by parol evidence is not applicable here. This case, on the facts, is ruled by the principle announced in

the recent cases of *Hunt* v. *Davis,* 98 Ark. 44, and *Haldi-man* v. *Taft,* 102 Ark. 45. In the latter case the court, speaking of certain representations made in a trade concerning the worth of certain stock, said: "If he (the seller) made that representation, and knew, or ought to have known, that the stock was not worth that much, he was guilty of making a false representation, which, if relied on by the other party, became the inducement for the trade. There is evidence that he was treasurer of the corporation, and had actual knowledge of its financial condition. But, even if he was without actual knowledge on the subject, he occupied a position which was tantamount to holding himself out as having such knowledge, and it is unimportant whether he did possess the knowledge or not. Under those circumstances, it was his duty to have informed himself before making any statement to a party with whom he dealt."

Appellant claims that any representations he made to appellee concerning the financial condition of the corporation could not have misled the appellee, and that appellee had no right to rely upon same, for the reason that he had the same means of information that appellant had and the same access to the books, and knew as much about the financial condition as did appellant. But the evidence does not warrant this conclusion. While appellee could have looked at the books of the corporation, he did not have charge of the books, whereas appellant did have the custody of the books and papers and was in the active management of the affairs pertaining to the oversight of the books and keeping the same in proper condition. Appellee was not negligent in his failure to consult the books of the corporation to ascertain whether or not the financial statement was true, but he had the right, under the circumstances, to rely upon the representation of the appellant that the same was true.

Appellee, by his conduct with reference to the financial statement, notified the appellant that he was relying upon his furnishing a correct statement. While there

was no legal fiduciary relation between appellant and appellee, still, under the circumstances, appellee had the right to rely upon the statement of appellant as to the financial condition of the corporation, because, according to appellee's testimony, which is not disputed, he made inquiries of appellant and gave him to understand, in effect, that he was going to rely upon the truth of the statement that appellant furnished.

Mr. Pomeroy says: "Not only where the vendor thus occupies a fiduciary position towards the purchaser, independently of the sale, but also when, in the very contract of sale itself, or in the negotiations preliminary to it, the purchaser expressly reposes a trust and confidence in the vendor, and when, from circumstances of that very transaction, or from the acts or relations of the parties in connection with it, such a trust and confidence reposed by the purchaser is necessarily implied in the contract of sale, it is the duty of the vendor to make a like disclosure, and his failure to do so is a fraudulent concealment." 2 Pom. Eq. Jur., § 904, p. 1617.

The circumstances under which English and the appellant made the statement and furnished the same to the appellee for the purpose of having him rely on the same, and to influence him to endorse the note and execute the contract, were such as to advise appellant that appellee was relying upon appellant's peculiar knowledge of the facts disclosed by the statement which appellant was furnishing "for the purpose of having the trade go through." See *Jarratt* v. *Langston,* 99 Ark. 438.

Appellant contends that the appellee is not entitled to recover because the appellant made the statement believing the same to be true. There was testimony by both appellant and appellee to the effect that the appellant believed that the statement was correct and that there was no actual intent upon his part to mislead appellee. In other words, that there was no dishonest motive upon appellant's part in making the representation contained in the statement, although same proved to be untrue. But, upon this point, Mr. Pomeroy states the

doctrine as follows: "If a statement of fact, actually untrue, is made by a person who honestly believes it to be true, but under such circumstances that the duty of knowing the truth rests upon him, which, if fulfilled, would have prevented him from making the statement, such misrepresentation may be fraudulent in equity, and the person answerable as for fraud, forgetfulness, ignorance, mistake, can not avail to overcome the pre-existing duty of knowing and telling the truth." 2 Pom. Eq. Jur., § 888, p. 1584. See also *Haldiman* v. *Taft, supra.*

The decree is correct, and it is affirmed.