ROMUNDER *v.* CASKEY, RECEIVER.

Opinion delivered February 24, 1919.

1. CONTRACTS—MUTUAL PROMISES—CONSIDERATION.—A contract of sale of bank stock for a price named and upon terms specified, being based upon mutual promises, is binding upon the parties, though it recites no consideration.

2. BANKS AND BANKING — PURCHASE OF BANK STOCK — WAIVER OF AUDIT.—Where a purchaser of bank stock accepted the stock and served as director and president of the bank, without insisting upon an audit of its accounts to which he was entitled, he will be held to have waived such audit.

3. BANKS AND BANKING—SALE OF STOCK—EVIDENCE.—Evidence held to show that a sale of bank stock had been consummated.

4. BANKS AND BANKING—MISREPRESENTATIONS BY SELLER OF STOCK—REMEDY.—Where bank stock held by a stockholder was sold through misrepresentations by him concerning the condition of of the bank, his fraud does not prejudice the rights of the bank or its creditors; the buyer's remedy being against his vendor.

5. SALE—FRAUD—RESCISSION.—One who buys bank stock held by the bank as treasury stock upon misrepresentations by the bank's agent as to the bank's condition may rescind the purchase upon discovery of the fraud.

6. SALE—FRAUDULENT SALE OF STOCK—REMEDIES.—A buyer may sue his seller in equity to rescind the sale of corporate stock induced by fraud, or he may sue at law for damages.

7. CORPORATIONS—STOCK SUBSCRIPTIONS—WAIVER OF FRAUD.—Where a treasury stock subscription has been secured by fraud, the fraud, if not waived, may be pleaded as a defense in an action by the seller for an unpaid stock subscription.

8. BANKS AND BANKING — TRANSFER OF STOCK — STATEMENT.—The mere fact that a bank's statement, upon which a contract for the purchase of bank stock was made, listed the bank's interest in certain corporations under the item of "stocks and bonds" did not render the statement false or fraudulent, though such interest was not represented by stocks and bonds where the bank's interest in such companies was not overvalued and such assets were not otherwise listed in the statement.

9. BANKS AND BANKING—TRANSFER OF BANK STOCK—FRAUD.—The mere fact that a bank's statement, upon which a contract for the purchase of bank stock was made, listed the banking house under the heading "Banking house, furniture and fixtures," though there was a heading "real estate," did not render the statement fraudulent.

10. BANKS AND BANKING — TRANSFER OF STOCK — STATEMENT.—The mere fact that the statement upon which a contract for the sale of bank stock valued the bank's building at $5,000, when it cost only $3,500, was not fraudulent where the parties to the contract agreed upon that valuation.

Appeal from Prairie Chancery Court, Northern District; *John M. Elliott,* Chancellor; affirmed.

*W. A. Leach,* for appellant.

Appellant was never a stockholder in the bank. There was no consideration for the "memorandum of understanding" he signed, and his purchase of stock was brought about by false and fraudulent representations. The assets and liabilities of the bank were gross misrepresentations and fraud upon him and avoided the agreement to purchase stock. No stock was ever delivered to him. None of the conditions upon which he was to purchase stock were ever complied with. He was never an officer or a director in the bank. The findings of the court are contrary to the law and the evidence and he was clearly defrauded. Can plead this fraud against a suit by the receiver. 109 Ark. 297; 131 *Id.* 382; 10 Cyc. 437; 4 Thompson on Corp., § 3841; 7 R. C. L., § 211; 18 L. R. A. (N. S.) 347; 16 Ann. Cases, 179; 18 L. R. A. (N. S.) 347; High on Receivers (3 ed.), § 245; Wait on Insolvent Corp., § 235; 29 Conn. 384; 79 Ind. 293; 79 Ind. 293; 23 Barb. 636.

*J. G. Thweatt* and *Sam Frauenthal,* for appellee.

1. The testimony shows that appellant purchased the stock from the bank and became the owner thereof and was held out to the world as president of the bank and knew that he was so held out to the world. Deposits were continually being made and in April, 1913, the deposits exceeded $25,000. The receiver is the representative of the depositors and creditors of the bank, and is entitled to recover on appellant's unpaid stock to pay these depositors and creditors. It is conceded that the liabilities of the corporation exceeded the entire amount of unpaid stock and the chancellor properly entered a decree directing the receiver to demand payment of the amounts due on unpaid stock and sue for same. No call was necessary as the order of court was equivalent to a call where the liabilities exceeded the amount due on unpaid stock. 7 R. C. L. 387, § 371. The principle of this case is sustained in 146 U. S. 689 (36 Law. ed., 1139); 72 Fed. 960; 31 L. R. A. (N. S.) 365; 33 *Id.* 895; 101 U. S. 205 (Law. ed., 885).

2. If appellant purchased the stock from Vaughan and purchased other unsubscribed stock, he is liable for the amount of the unpaid stock and it is conceded that 80 per cent. of the stock is unpaid. The transferee is liable to the same extent as the transferer. 91 U. S. 65 (23 L. ed., 384); 7 R. C. L. 256, § 234; *Ib.,* p. 276, § 254; 10 Cyc. 701; 91 U. S. 45 (L. ed., 203); 96 U. S. 328 (24 L. ed., 818).

3. It is conceded that appellant did act as president of the bank and had examined the books prior to the written contract and he is liable and the decree below is right and should be affirmed. He was not induced to purchase by false representations, but if so it was Mr. Vaughan who made these misrepresentations, and he alone would be liable and not the bank nor the receiver. 7 R. C. L. 241, § 214; 181 U. S. 202 (45 L. ed., 822); 31 L. R. A. (N. S.) 900. The statement of resources and liabilities furnished by Mr. Vaughan was correct and appellant was fully advised of the condition of the bank. The state-

ment of the items as to "real estate, banking house, furniture and fixtures," etc., was not fraudulent nor misleading. There was nothing wrong in it and there is no error in the decree. See cases *supra.*

HUMPHREYS, J.  This suit was instituted in the Prairie Chancery Court, Northern District, by appellee, W. J. Caskey, receiver of an insolvent banking corporation styled "Des Arc Bank & Trust Company," under an order of court, against appellant and other stockholders of said bank and trust company, to recover unpaid balances due on stock alleged to have been purchased by each. The complaint contained, among other allegations, the following: That appellant purchased 734 shares of stock of the par value of $25 per share, on which there had been paid $5 per share, leaving a balance of $20 per share due and unpaid; that the amount due to the depositors was greater than the total amount of the unpaid stock which had been subscribed and held and owned by all of said stockholders; that appellant had made a transfer of certain real estate in Prairie County, without consideration, to Henrietta L. Greening who thereafter conveyed it to his wife for the purpose of defrauding his creditors; that appellant was a nonresident of the State of Arkansas. Based upon said allegations appellee prayed judgment for the balance due on the stock; for an attachment and for an order setting aside the conveyances and subjecting the land to the payment of the sum claimed.

Appellant denied that he was the owner of any stock in said bank and trust company or that he was obligated to the bank in any sum on stock subscriptions or purchases of stock; but stated that if the facts reveal that he purchased 734 shares of stock in said company, as alleged, the purchase was induced by a false and fraudulent statement of the resources and liabilities of said bank and trust company made by Emmett Vaughan who was the president of the bank, and that the purchase of said stock was vitiated on account of the fraud practiced upon him.

By agreement, the cause was continued as to all the defendants except Herman and Emily Romunder, and, as to them, was submitted on the pleadings, depositions of witnesses and exhibits thereto, from which the court found that appellant purchased 734 shares of stock in the Des Arc Bank & Trust Company, and owed thereon eighty per cent. of the purchase price, or a total of $15,-600; that the conveyances of certain real estate in Prairie County by appellant to Henrietta L. Greening, and by Henrietta L. Greening to his wife, Emily Romunder, who was also made a party to this suit, was without consideration and made in fraud of his creditors; and that the grounds for attachement were established by the proof. Thereupon the court rendered judgment in favor of appellee against appellant for the sum of $15,600 with interest, canceled the deeds to said real estate, sustained the ground of attachment and subjected the lands to the payment of the judgment, from which judgment an appeal has been prosecuted to this court.

The Des Arc Bank & Trust Company was organized with an authorized capital stock of $50,000 on the 1st day of August, 1907. The capital stock was divided into two thousand shares of $25 each, and sold by subscription for par value, twenty per cent. of the purchase price being paid in cash. Emmett Vaughan became the owner of 1,100 shares of stock by subscription and purchase, and, on the 5th day of June, 1912, entered into a written agreement with appellant, Herman Romunder, for the sale of 550 shares of the stock owned by him, and 184 shares of treasury stock owned by said bank and trust company. The agreement, in so far as concerns the questions involved on appeal, is as follows:

"Memorandum of understanding made in South Bend, Indiana, on the 5th day of June, 1912, between Herman Romunder of the city of Mishawaka, County of St. Joseph and State of Indiana, and Emmett Vaughan of the town of Des Arc, County of Prairie and State of Arkansas.

"1st.   That said Herman Romunder·agrees to buy from said Emmett Vaughan five hundred and fifty (550) shares of the stock of the Des Arc Bank & Trust Company of the par value of $25 each for the sum of $2,750; now the property of said Emmett Vaughan, under statements made by him, and also to purchase from the stock now in the treasury of said bank and trust company one hundred and eighty-four (184 )shares of the par value of $25 each, for the sum of $920; giving for same his demand note payable at said Des Arc Bank & Trust Company with interest at the rate of 6 per cent. per annum from date until paid.

"2nd.   It is contemplated and understood under this memorandum that the reorganization of bank shall take place at as early a date as be found convenient to said Herman Romunder.   Said board of directors to be elected under said reorganization to be constituted as follows and to be comprised of five persons, stockholders of said Des Arc Bank & Trust Company, as follows:   Herman Romunder, Robert H. Romunder, Cannie W. Jones, Emmett Vaughan and R. A. Richmond.

"3rd.   Under said reorganization and convening of its board of directors said Herman Romunder is to be elected President, Robert H. Romunder vice president and Emmett Vaughan cashier and secretary.

"4th.   *   *   *   *   *   *   *   *

"5th.   It is understood under this memorandum that all lands now held by the bank are to be deeded to Herman Romunder as trustee and the proper and agreed contract values for same are to be carried on the books as a Loans and Discount Account.

"6th.   It also agreed that proper by-laws be prepared to be placed before stated board of directors when held for their consideration and acceptance to govern the operation of said Des Arc Bank & Trust Company in detail.

"7th.   It is also understood and agreed that the proper endorsement is to be made on all shares of stock issued and to be issued which shall preclude its sale to

parties not desired by the parties signing this memorandum and that such endorsement shall govern the present interest held by the signers thereto.

"8th.   *   *   *   *   *   *   *   *

"9th.   Above matters are to be adjusted as stated and above reorganization made as designated on verification of statement on which this understanding is based and performance is to take place on or before July 1, 1912.

"In witness the parties named herein have duly signed this memorandum in the city of South Bend, County of St. Joseph and State of Indiana, on the day and date first above written.   "HERMAN ROMUNDER,
"EMMETT VAUGHAN."

The statement on which the aforesaid written agreement was based was a statement of the resources and liabilities of the bank, with explanations of the items of resources and liabilities.   The statement is as follows:

"RESOURCES.

| | |
|---|---|
| "Loans and discounts | $10,871.48 |
| County, city and school scrip | 1,910.27 |
| Stocks and bonds | 6,000.00 |
| Real estate | 20,749.67 |
| Branch banks | 60.75 |
| Banking house furniture and fixtures | 7,255.60 |
| Overdrafts | 1,550.77 |
| Farm account | 46.95 |
| Expense account | 351.78 |
| Mill account | 1,702.46 |
| Cash and due from banks | 18,142.46 |
| | $68,642.19 |

"LIABILITIES.

| | |
|---|---|
| "Capital stock paid in | $ 6,420.00 |
| Bills payable | 5,000.00 |
| Re-discounts | 5,000.00 |
| Time deposits | 307.00 |
| Individual deposits | 51,915.19 |
| | $68,642.19" |

The accompanying explanation of the items material to a determination of the questions raised on appeal concerns the items of "stocks and bonds;" "real estate," "banking house furniture and fixtures," "farm account," and "mill account." The explanation of the item of stocks and bonds is as follows: "This item is represented by $5,000 stock in the Brittain Lumber Company, the new dimension stock mill just located here. They are practical men, and have one of the best plants of the kind I have ever seen. It also includes the canning factory which originally cost $6,000 and $500 investment in the Home Life & Accident Company, now paying 2½ per cent. quarterly dividends."

The material part of the explanation of the item of "real estate" is as follows: "The item is represented by the list of lands enclosed * * *."

The explanation of the item of "banking house furniture and fixtures" is as follows: "This item explains itself and you have seen it all. I think I have one of the nicest little banks in the State; have been told so by many traveling men."

The explanation of the item of "farm account" is as follows: "I am responsible for this account."

The material part of the explanation of the item of "mill account" is as follows: "This item represents the balance of the loss sustained by the panic * * *."

It is insisted by appellant that the aforesaid written agreement is void because it failed to recite a consideration. It is true the contract recited no consideration and at the time it was signed nothing actually passed between the parties as a consideration, but the contract contained the express promise by Herman Romunder to buy 550 shares of stock from Emmett Vaughan and 184 shares of treasury stock from the Des Arc Bank & Trust Company, on or before July 1, 1912, upon verification of the statement of the resources and liabilities of the bank furnished by Emmett Vaughan to Herman Romunder, and an implied promise by them to sell him said stock for the price and upon the terms specified in the agreement. The

contract was, therefore, supported by mutual promises and was binding on the parties.

It is contended that appellant did not become a stockholder in the Des Arc Bank & Trust Company because no audit of the bank's books and verification of Emmett Vaughan's statement of the bank's resources and liabilities was made prior to July 1, 1912. The contract is silent as to who should verify the books. Appellant testified that the bank was to have its books audited and furnish him with the audit. Vaughan testified that appellant came with his agent, H. P. Daly, who was appellant's agent in the purchase of the bank stock and an expert accountant, for the purpose of examining the books and verifying the statement, and that he, Vaughan, got the books out for that purpose, but that appellant left in the forenoon without making any examination, and that Mr. Daly said that he was satisfied with the statement and left in the afternoon without examining the books. Thereafter, the Vaughan stock was canceled and reissued, one-half to Vaughan and the other half to appellant and the bank was reorganized, as provided in the agreement. Appellant then served in the capacity of director and president of the bank until it failed. These circumstances are corroborative of Vaughan's testimony and have convinced us that appellant waived a verification of the statement by an audit of the books.

Again, it is insisted that the contract for the purchase of the stock was never consummated and was executory when the bank failed. Appellant testified that he never paid for or received the stock; that he never knew of the reorganization of the bank; that he did not act as director and president of the bank after its reorganization until its failure. Vaughan testified to the contrary and the facts and circumstances of the record strongly corroborate his evidence. It appears reasonably certain from the record that a stockholders' meeting at which all the stock was present in person or by proxy, was held on June 14, at the request of appellant, for the purpose of carrying out the agreement. At the meeting, it was an-

nounced that Vaughan had sold 550 shares of his stock and 184 shares of treasury stock to appellant. The stock was canceled and reissued, 550 shares to appellant and 550 shares to Vaughan. One hundred and eighty-four shares of treasury stock were issued to appellant, one share to his nephew, who was to become vice-president, and one share to Mrs. Cannie W. Jones, secretary at appellant's Buena Vista Veneer Company's plant. The stocks issued to appellant were endorsed as provided in the agreement. Proper certification of the purchase of stock was filed in the county clerk's office. Appellant was notified by mail of the reorganization of the bank. Directors were elected and new officers selected in keeping with the agreement. Publication of this fact was made. Stationery was printed and used carrying appellant's name as president of the bank. Calendars also carrying appellant's name as president were distributed. Checks were issued by appellant's veneer plant with slips attached announcing that he was president of the bank. Emmett Vaughan, the cashier, corresponded from time to time with appellant concerning the business of the bank. Appellant and Mrs. Jones stated to others that appellant had bought stock in the bank. Appellant signed two notes, as president, for the purpose of raising money either for the bank or for the use of his veneer plant. He used the indorsement or guarantee of the bank to borrow a large sum of money for his veneer plant. These and other circumstances in the record have convinced us that the weight of the evidence is to the effect that appellant was the owner of 783 shares of stock in the Des Arc Bank & Trust Company, on which he had only paid twenty per cent. of its face value when the bank failed.

It is contended, however, by appellant, that, even though a stockholder, he is not liable because the purchase of the stock was induced by false and fraudulent statements of Emmett Vaughan as to the financial condition of the bank on April 27, 1912. Appellant purchased 550 shares of the stock from Emmett Vaughan. Emmett Vaughan, or his assignee, was responsible to the

depositors of the bank for the unpaid balance due on the stock for the purpose of liquidating the indebtedness due the depositors. This stock was Vaughan's individual stock and if he sold it to appellant through misrepresentations concerning the condition of the bank, it did not prejudice the rights of the bank or its creditors. Appellant's only remedy for fraud, if practiced upon him, was against his vendor, Vaughan. 7 R. C. L., p. 241, sec. 214; *Scott* v. *Dewees,* 181 U. S. 202; *Gress* v. *Knight,* 31 L. R. A. 900. The sale of the treasury stock, however, if induced by fraud of the bank's representative in making the sale, was subject to a rescission by the purchaser upon discovery of the fraud. The treasury stock belonged to the bank and was sold for it by the then president and cashier, upon a statement furnished at the time, showing the resources and liabilities of the bank. If this statement was false in any material part, the sale was not binding on appellant. It is well settled that a vendee may sue a vendor in equity to rescind the sale of stock induced by fraud, or sue at law for damages on account of the fraud. *Jarratt* v. *Langston,* 99 Ark. 438; *Grant* v. *Ledwidge,* 109 Ark. 297; *Porter* v. *Morris,* 131 Ark. 382. And unless the fraud had been waived by word or act, it seems well settled that it may be pleaded as a defense to a suit by the vendor for unpaid stock subscriptions. 7 R. C. L., sec. 211; 4 Thompson on Corporations, sec. 3841; *Porter* v. *Morris,* 131 Ark. 382. It then becomes necessary to determine whether Vaughan's statement as to the financial condition of the bank on the 27th day of April, 1912, was true or false. It is contended that the statement was false, (1) in representing that the bank owned $6,000 in stocks and bonds; (2) in the number of acres of land, and the value thereof, owned by the bank; (3) in twice listing the banking house as an asset, and (4) in misstating the items of "farm account," "expense account," and "mill account."

(1) The explanation of the item of "stocks and bonds" is that the bank owned an interest to the extent of $5,000 in the Brittain Lumber Company, and owned

the canning factory which originally cost of $6,000. The interest in neither was represented by stock or bonds. The bank afterwards sold its interest in the Brittain Lumber Company for about $5,000 and the evidence showed that the value of its interest in the canning factory was not less than $1,500. The only interest under the item of "stocks and bonds" which was really held in stock was a $500 investment in the Home Life & Accident Company, paying 2½ per cent. quarterly dividends. It appearing that the bank really owned an interest in these concerns to the amount of $6,000, the mere fact that it was carried under the heading "stocks and bonds" was not and could not work an injury to a purchaser. Especially is that the case here because there was an accompanying explanation of that item. The interest in these institutions was not listed as a resource under any other head. We do not think the mere fact that these assets were listed under the heading "stocks and bonds" rendered the statement false or fraudulent.

(2 and 3)   It is contended that the banking house carrying a value of $5,000 is entered in the statement under the heading "banking house furniture and fixtures" and duplicated under the heading "real estate" and, in that way, listed twice as an asset. This cannot be, for the reason that to the explanation of the item of real estate is attached a list of all the real estate going to make up that item. It has reference solely and wholly to acreage and not to town lots. The list attached shows 2,548.37 acres, and the weight of the evidence is to the effect that it was valued at $8 per acre, or given a total valuation of $20,749.67. But it is suggested that on the 27th day of April, 1912, the books only showed that the bank owned 2,090.40 acres. It appears, however, that on that day Vaughan conveyed 457.97 acres to the bank and included it in the statement, which makes the total number of acres represented by Vaughan as belonging to the bank correct. We are convinced from the whole evidence that no misrepresentation was made either as to the number of acres or the valuation thereof, and further convinced

that the banking house was a separate and distinct asset from the asset listed under the head of "real estate." These assets were carried under separate headings or as separate items on the books, and, therefore, the statement showing them under separate headings, or as separate items can not be regarded as a false statement. It is suggested that the banking house only cost $3,500 and that the entry of $5,000 for the banking house was a false and fraudulent statement. This matter was discussed prior to and at the time the contract was made and a value of $5,000 for the banking house was agreed upon between the parties.

(4) It seems that the items under the heading of "farm account," "expense account" and "mill account" in the satement of resources furnished by Vaughan to Romunder at the time the contract was entered into for the purchase of the stock corresponds with entries carried in the books of the bank. The item of $46.95 under "farm account" was explained by simply saying that Vaughan was responsible for it. As to the items under "expense account" and "mill account," there seems to be no contention that there is a conflict between the entries in the statement and the entries in the book, but it is insisted that under the evidence both have been minimized. The evidence is somewhat conflicting, but, after a careful reading thereof, we are convinced that the weight of the evidence sustains the finding of the chancellor that the items were correctly entered in both the statement and the books. At least, we are unable to say that the findings of the chancellor are clearly against the weight of the evidence.

No error appearing in the record, the decree is affirmed.