## Robinson v. Florence Sanitarium.

### Opinion delivered June 27, 1921.

1. Specific performance—fraud—weight of evidence.—In a suit by a vendor for the specific performance of a contract for the purchase of real estate, a finding of the chancellor that the officers of the vendor who negotiated the sale were not guilty of misrepresentation *held* to be supported by preponderance of the evidence.

2. Frauds, statute of—completed contract.—In a suit by a vendor to enforce specific performance of a contract of sale of real estate, where the statute of frauds was not pleaded, it must be taken as conceded that the written bid of the vendee for the property, accompanied by his check, and its acceptance by the officers and stockholders of the vendor, constituted a completed executory contract for the sale of the. property.

3. Specific performance—to whom granted.—The remedy of specific performance may be granted to a vendor, as well as to a vendee, of real property.

4. Specific performance—when contract enforced.—A contract for the sale of real estate will not be specifically enforced unless it is free from fraud, misrepresentation, mistake, or illegality, and is fair and just in its terms.

5. Specific performance—misrepresentation.—An untrue statement of a material fact will prevent specific performance, irrespective of the party's intent to deceive, where the other party relied upon such misrepresentation.

Appeal from Jefferson Chancery Court; *John M. Elliott*, Chancellor; affirmed.

*Bridges & Wooldridge,* for appellant.

Appellee does not come into court with clean hands, but comes trying to enforce a contract that was obtained by unfair methods. Fairness and honesty in business

dealings is demanded, especially in chancery courts. Specific performance is within the sound discretion of the court, and if the contract is inequitable it will not be enforced. One seeking equity must come into court with clean hands. The contract must be free from fraud, mistake, misrepresentation, or illegality. 25 R. C. L., p. 223, § 21; Pomeroy's Eq. Jur. (3 ed.), vol. 4, § 1405; 86 Ark. 600; 125 *Id.* 572; 75 *Id.* 46. Misrepresentation is material. 100 *Id.* 144; 82 *Id.* 20. Deceit is fatal, as is misrepresentation. 30 Ark. 535; 109 *Id.* 297; 115 *Id.* 297; 43 *Id.* 464; 115 *Id.* 304. An executory contract will not be specifically enforced where the vendor has made farudulent material misrepresentations. 175 N. W. 329; 53 S. E. 593; 12 R. C. L. 283-4; 35 L. R. A. (N. S.), p. 185 and notes, and p. 189. The decree is against the clear preponderance of the testimony and should be reversed. 143 Ark. 307.

*Coleman & Gantt,* for appellee.

The appeal presents only a question of fact and the finding is amply supported by the evidence. The alleged misrepresentations had nothing to do with the contract itself but only with the amount bid, so any possible injury done appellant was removed by reducing the bid. 2 Pom., Eq., §§ 889, 899. But under the testimony appellant voluntarily offered to pay $30,000 for the property and he should be required to pay it.

A statement, to make it a misrepresentation, must be a positive affirmation of a fact and not a mere expression of opinion. 36 Cyc. 600. Niven's statement was a mere expression of opinion. The mere fact that Niven was president of appellee did not authorize him to sell its property or make admissions binding it. 14 C. J. 444, 476.

When all the testimony is considered, the contract was fairly entered into and should be specifically enforced. 224 S. W. 984; 140 Ark. 384; 137 *Id.* 414. So far as the terms of payment are concerned, the decree conforms *verbatim* to appellant's proposal; the deed tendered is also in accordance with the contract, but, if

not, appellee stood ready to correct it and had the right to do so. 73 Ark. 491; 83 *Id.* 340. The decree is right, and no error is shown.

WOOD, J. The appellee instituted this action against the appellant in the Jefferson Chancery Court, alleging that it was owner of a certain half block of land with the improvements thereon in the city of Pine Bluff, Arkansas; that it agreed to sell the land to appellant for the sum of thirty thousand dollars, as evidenced by a written bid or offer from the appellant to the appellee of that sum for the purchase of the property. With the offer was a certified check for $4,500 cash, and the balance to be paid in three years at eight per cent. per annum, payable semi-annually, with the privilege of paying the sum of $500 or any multiple therof at any interest-paying period. Appellee alleged that it accepted the proposition, and on August 26, 1920, it executed and delivered to the appellant its warranty deed conveying the property to him in accordance with the agreement; that appellant had stopped the payment of the check given to the appellee as earnest money and had refused to accept the deed which appellee tendered, and prayed that the appellant be required to specifically perform the contract.

The appellant answered, and, after denying all the material allegations of the complaint, set up that, if the offer alleged was made, it was made because of the representation of the president of the appellee, who assumed to represent it in conducting the negotiations for the sale of the property; that he represented that the proposed sale embraced everything -in the building execept groceries, one chair, and a few surgical instruments; that the appellee discovered, before concluding the purchase, that there were many other valuable furnishings of the building which did not belong to the appellee, and which appellee could or would not include in the conveyance; that these furnishings which did not belong to appellee were worth two or three thousand dollars or more; that, after making this discovery, appellant notified the appellee that he would not purchase the property. Appellant further alleged that on or about the 7th of August, 1920, he did

offer to the president of the company the sum of $29,000
for the property, including all the furnishings and con-
tents; that the president on the same day informed the
appellant that another person had offered $30,000, and
that it would require $30,000 to purchase it; that it was
upon this representation that appellant delivered to the
president of the appellee an offer to purchase the build-
ing and its contents for the sum of $30,000, but appel-
lant learned that the appellee had not had an offer for
$30,000 for the property, and he thereupon notified the
appellee that he would not purchase. The appellant also
alleged that he gave the appellee a check for the sum of
$4,500, which had not been paid by the drawee bank, but
was withheld from the appellant. He prayed that the
appellee be required to surrender the check.

The appellee also instituted an action against the
drawee bank to recover judgment for the amount of the
check which the bank had refused to pay. The bank an-
swered and alleged that, before the check was presented,
the drawer of the check had notified it not to pay the
same. It asked that Robinson, the drawer of the check,
be made a party, and that, in order to avoid a multiplicity
of suits the cause be transferred to the chancery court
and consolidated with the suit of appellee against the
appellant pending therein. The transfer and consolida-
tion were made.

The appellee is a domestic corporation and owns the
property in controversy on which it maintains and con-
ducts, as its name indicates, a hospital or sanitarium.
D. B. Niven testified that he was the president of the ap-
pellee; that the appellant delivered to him a written pro-
posal to purchase the hospital, which he identified, and
the same was introduced in evidence and is substantially
as set forth in the complaint. He further testified sub-
stantially to the facts as they are alleged in appellee's
complaint. He testified that he told appellant that cer-
tain doctors had some surgical instruments in the hos-
pital that were not the property of the appellee; that wit-
ness did not know anything about these instruments, but

that the only personal property that the appellee could sell to the appellant was contained in an invoice that the appellee had obtained from Doctor Jordan, from whom it had purchased the property. Witness called appellant's attention to this invoice. Witness told appellant that the appellee paid for the stuff on the inventory the sum of $10,000. Witness did not know anything about the surgical instruments, but did undertake to tell the appellant about the furniture. He told appellant that the furniture was worth $2,500; that he could realize as much out of the furniture as it would cost him to change the sanitarium into an apartment house as appellant contemplated doing. It had been furnished and was being operated as a hospital. The witness stated that the appellant, the day before the board of directors were to receive bids, came into witness' office, and, after they had gone over the value of each department in detail, appellant made a bid of $29,000. The next morning one of the directors, Doctor Jordan, asked witness if anybody had sent in any bids, and witness informed him that there had been a bid of $29,000; whereupon Doctor Jordan said that it was no good—that he had a better one. Witness felt interested in appellant, inasmuch as he had discussed the proposition in a confidential way with witness, and witness thought that he wanted to purchase the property. It wasn't time for the board meeting. Witness went over to appellant's office and told him that witness understood there would be a better bid than his and asked appellant to come to the meeting as he was a stockholder any way; that witness would be glad for him to come and protect his bid. Appellant asked witness to take care of his bid, and witness replied that he did not want to do that, and asked appellant to bid whatever he wanted to give. Appellant then asked witness for his bid and changed it from $29,000 to $30,000. When the board met witness presented appellant's bid, and it was accepted. Witness notified appellant, and he did not make any objection to it at the time, and never had made any objection to witness. Witness did not know what the amount of the

other bid was, and did not tell appellant that there would be a bid of $30,000. He told him that he had been informed that there was a better bid, and that appellant would have to raise his bid. The furniture had cost the appellee six or seven thousand dollars. Witness was sure that appellant was misled probably by the fact that witness told him that it had cost $10,000. He may have thought that witness told him it was worth that; witness knew that appellant could not get $10,000 for it because appellee had sold it to Howard for $7,000 and afterward bought it back. Witness had told the appellant that he thought $29,000 would buy the property, and, after Doctor Jordan told witness that he had a better bid, witness then informed the appellant of this fact and as already stated asked him to go to the board meeting. Witness told the directors he wished they would make the price $29,000 to the appellant because witness was the cause of appellant's raising his bid. Witness told them that he felt a little guilty, but he was entirely innocent in it. It was witness' unintentional misrepresentation that caused appellant to bid $30,000 for the property. Witness was sure that appellant would have got it for $29,000 and went to the board two or three times and tried to get them to take off the $1,000, but they wouldn't do it. Witness felt bad over it, and thought appellant ought to have it for $29,000 and wanted him to have it for that price as far as witness was individually concerned. Appellant afterward told witness that he did not want the property. Witness was only a small stockholder, and did not care personally whether appellant took it or not. In the conversations witness had with appellant he had acted as president of the appellee. In the conversation with reference to the personal property appellant did not seem to lay any stress on the furniture and stuff at all. He said that it was the kind of stuff that could not be used. Witness did not represent to the appellant that Doctor Jordan's surgical instruments in the hospital were contained in one case. Witness never discussed the title with appellant at all. Witness did not expect appellant

to take it unless the title was good. The board had their attorney to prepare the deed and tendered it to the appellant. The deed was introduced in evidence.

The attorney who prepared the deed testified that when he tendered the deed to appellant, appellant said that he did not know whether he wanted to take it or not because he was not getting all the personal property he expected to get, and that he had been caused to bid more for the property than he thought was necessary. Witness saw appellant again in a few days, and he still had not made up his mind, but after several weeks appellant finally told witness that he would not accept the deed. The deed was a warranty deed conveying the land with all improvements thereon and all furniture and furnishings belonging to the grantor and now in the building on said land, and contained recitals showing the terms of the purchase money in accord with the appellant's bid.

Mrs. Harris testified that she was a tenant in one of the houses on the sanitarium property at the time she heard that appellant had bought the same. It was reported in the paper. After that appellant came out and was looking around at the property, and witness asked him if he was the man who had bought the same, and he replied that he was. He told witness that he was about to tear the house down that she was living in, and said he would be glad if witness would look around for a new house. Appellant and Doctor Jordan had been out before that day.

Another witness, a Mrs. Reynolds, testified that she was also a tenant in one of the houses on the property and stated that, after she saw in the paper the statement to the effect that the appellant had purchased the property, the appellant was out looking at the house, and she asked him if he was the man who had purchased the property, and he said yes. He discussed with witness certain improvements that he contemplated making on the house in which she lived and discussed the amount of rent that witness was paying and asked witness what amount she could afford to pay. Afterward two of appellant's

plumbers came out and did certain work that was necessary to be done. Appellant went through the house in which witness lived and discussed with her the changes he was willing to make.

Doctor Jordan, one of the stockholders and a vice president and director of the appellee, testified that on Friday preceding the stockholders' meeting on the next day, appellant came to his office and asked if the sanitarium was for sale. Witness informed him that it was, and told him that the board wanted $35,000 for it; that for a speedy sale it might be had for thirty thousand, and witness and appellant began to figure it on that basis. Witness wrote out a proposition which he laid before the appellant as a tentative offer for the property at $30,000 with the terms specified. Appellant said that it was all right except for the cash payment of $5,000. Appellant stated that if the cash payment could be made $4,500, it was all right. Witness told him that could be arranged. Appellant stated that he would see his attorney and have him prepare the proposition in legal form, and appellant would bring it around in the morning with his check for $4,500. Appellee did not own any surgical instruments. The doctors furnished their own instruments, although they sometimes kept them at the hospital. On Tuesday following the Saturday on which the sale was made appellant and witness went all over the building together, and witness showed appellant all of its contents except the boiler room and showed him what witness claimed as his own property. The appellant then said, "I don't know what I am going to do with this doctor's junk." Witness replied, "Give me ten per cent. and I will sell it for you." Appellant replied, "The job is yours." Appellant meant by doctor's junk the tables, sterilizing plant and things of that kind which were considered hospital furniture proper. There were two cases containing surgical instruments worth several thousand dollars. Besides these, two or three doctors had small packages left on the operating tables. There were two of these

tables. The appellant did not give the witness a written bid of $30,000. Witness was requested by Harry Hanf to. let him bid on the property, and the stockholders' meeting was called for the purpose of negotiating with him. He had bid $27,500. Another man, Mr. Leo Andrews, one of the directors, said he would not let the property go for that. He was at the meeting but made no offer. Niven, the president of the appellee, had stated to witness that he had a proposition form appellant of $29,00, and witness told Niven that appellant had agreed with witness on $30,000; that he and appellant had talked it over, and that appellant said that $30,000 was all right.

The appellant testified that, in company with Doctor Jordan, he looked at the property in controversy on the afternoon of Friday, the 5th of August; that Doctor Jordan showed him all the rooms and their contents and told him that it had cost between eleven and twelve thousand dollars to furnish the building. While they were looking at it, Jordan asked witness, who was in the plumbing business, to send a man out to fix a certain defect in the sewer connecting one of the cottages. Witness talked with Niven in regard to the purchase and consulted with him about converting the building into an apartment house. Witness asked Niven if he had a list of the contents of the building, and Niven told witness that he thought there was one. Niven told witness that there were some groceries and a chair and some surgical instruments that Doctor Jordan had in one of the cases; that this was all that would. not be included in the sale. After receiving this information from Niven and talking again with Doctor Jordan, witness went back to see Niven and asked him what he thought about an offer of $28,000. Niven informed witness that he could not get the building for that, but he could get it for $29,000. Niven told witness that he could get six or seven thousand dollars out of the contents. Niven assured witness that he could get $2,500 or $3,000 out of the furniture. Witness stated that on Saturday morning, August 6, Doctor Jordan had left a memorandum of figures on witness' desk showing

the amount and terms that witness could buy the property for by assuming a building and loan mortgage of $13,000. The total amount as shown by the memorandum was $17,000, and by including the mortgage this made $30,000. On the morning of August 7, upon receiving positive assurance from Niven that he could obtain the property for $29,000, appellant made the written bid for that amount. This amount was raised to $30,000 in the afternoon. In a conversation with Niven that afternoon, Niven told appellant that the other parties had bid the sum of $30,000, and he wanted witness to raise this. Witness told him that he had already raised his bid $1,000 more than he thought the property was worth, and then Niven told him that the stockholders were his friends, and that if he would make his bid $30,000 he would see that the building was knocked down to him at that price. After discussing it for some time and Niven assuring him that he could get seven or eight thousand dollars for the contents, appellant, being ignorant of the cost of the doctor's stuff, thought maybe Niven was right, and then changed his bid from $29,000 to $30,000. Appellant then detailed a conversation which he had with Doctor Jordan on Tuesday evening thereafter when he went with Doctor Jordan to look over the building and other houses on the lot. He stated that Doctor Jordan claimed so much of the stuff that Niven hadn't told appellant about that he (appellant) "felt kind of sore," but didn't say anything. On the next day appellant was informed that there were only two bids for the property; one, his bid of $30,000, and the other a bid for $27,500. Appellant took the advice of his lawyer, found that the check he had given had not yet been paid, and he then arranged to stop the payment. Appellant then instructed his lawyer to inform the attorney and agents of the appellee that he would not take the property. Appellant also informed the appellee's attorney that he would not take the property and gave his reasons. About six or seven weeks thereafter the appellee's attorney came with some papers and asked appellant if he was ready to close up the

deal. Appellant informed him that he thought the deal was over. The attorney requested appellant to see Niven again. Appellant saw Niven, and he said that he was very sorry that he had raised appellant $1,000 on the bid and felt mighty mean about it. He told appellant that he had done everything he could with the board of directors to get them to take the $29,000, but could not succeed. Witness further stated that on his first trip with Doctor Jordan to examine the building and its contents, Doctor Jordan made no reservations, and that witness understood that all of the things that Doctor Jordan was pointing out went with the sanitarium, the surgical instruments, hospital equipment and other things; that he would not have made the proposition to purchase the building at $30,000 if he had known or had been told that Doctor Jordan claimed all the things which he afterward claimed, as they were the best and most valuable of the contents that Niven had represented that he would get seven or eight thousand dollars for. Appellant was influenced to raise his bid to $30,000 because of the statement of Niven that other persons had offered that sum for the property. Appellant denied that he had told Doctor Jordan that he would give $30,000 for the property, and he had not said anything which would lead Jordan to believe that he would make an offer of that amount. The greatest amount appellant had offered was $28,000. Appellant had known and done business with Niven a long time, and had confidence in his judgment and reputation. When Niven told him he had been offered $30,000 by other persons, he believed him. Appellee had never given him any notice of the acceptance of his offer except the verbal statement of Doctor Jordan and Mr. Niven. Witness further testified on cross-examination that he did not know why Niven wanted him to raise his bid to $30,000 when he had already made a bid for that amount, but supposed that Niven was doing him a favor. When appellant went through the building with Doctor Jordan on Tuesday after appellant had been informed that his bid had been accepted, when Doctor Jordan pointed out

the things that he claimed, appellant did not challenge the claim of Doctor Jordan because he thought perhaps Doctor Jordan was right and owned all he claimed. Appellant also stated that his plumbing records showed that he had repaired a sewer on the property before purchasing the same.

The above are substantially the facts upon which the chancellor rendered a decree in favor of the appellee against the appellant for specific performance of the contract according to the prayer of appellee's complaint, and against the bank for the payment of the check given by the appellant to the appellee as a cash payment on the purchase. From that decree is this appeal.

The chancellor found the facts to be as they were set forth in the apellee's complaint. There is a sharp conflict in the testimony upon some of the material issues of fact, and we are convinced that the preponderance of the evidence shows that the chancery court was correct in its findings.

The statute of frauds was not pleaded, and it must therefore be taken as conceded that the written bid of the appellant for the property, accompanied by his check and its acceptance by the board of directors and stockholders of the appellee in a meeting duly called for that purpose, constituted a completed executory contract for the sale of the property in controversy. "The remedy of specific performance may be granted to a vendor of real estate." *Wilkins* v. *Eanes*, 126 Ark. 339-340-342. The appellee therefore had the right to call upon the appellant to specifically perform this contract unless the appellee, through its duly authorized agents who were conducting the negotiations in its behalf, made fraudulent representations concerning the property, or such representations as, even though not fraudulent in fact, were nevertheless of such character as to deceive and mislead the appellant, and such as would constitute a fraud in law against the rights of appellant and render it inequitable to compel him to perform his contract. "The contract must be free from fraud, misrepresentation,

mistake, or illegality. It must be perfectly fair, equal and just in its terms and in its circumstances." 4 Pomeroy's Equity Jur. 1405; *Cleavenger* v. *Stearnes*, 53 S. E. 593.

An untrue statement of a material fact will prevent specific performance, irrespective of party's intent to deceive, where the party relied upon such misrepresentation. *Taliaferro* v. *Boyd*, 115 Ark. 297; *Grant* v. *Ledwidge*, 109 Ark. 297.

Applying the above well-established principles to the facts of this record, we are convinced that the appellant had no right to refuse to perform his contract. Neither Doctor Jordan nor Mr. Niven, who conducted the negotiations on the part of the appellee with the appellant leading to the latter's bid and acceptance thereof, by appellee, occupied any legal relation of confidence and trust to the appellant. He was dealing with them at arm's length. True, appellant and Niven testified that appellant had consulted Niven as a trusted friend and in a confidential way, but that did not create any legal relation of trust and confidence between them. Appellant knew that Niven was the president of the appellee. Niven and Jordan were representing the appellee, and, according to their testimony, which we are unwilling to discredit, they made no representation to the appellant which was false in fact, and it is clear to us that they did not intend to mislead or deceive him. We do not discover any collusion between them to have the appellant increase his bid from $29,000 to $30,000. It appears that Niven had told appellant that he thought $29,000 would buy the property, and upon that suggestion appellant lodged a bid with him for that amount. It appears also that appellant had told Jordan that he was willing to pay $30,000 for the property. Jordan asked Niven on the morning of the day of the sale if he had received any bids and Niven replied in the affirmative and told him that he had received a bid for $29,000. Whereupon Jordan stated that he had a better bid, but, according to Niven, Jordan

did not inform him who had made the bid for the amount thereof.   Upon receiving such information from Jordan, Niven went back to the appellant, thinking that he wanted the property, and in good faith believing that some one else had bid more than appellant, informed the latter that there was a better bid.   Appellant then requested Niven to act for him, which Niven refused to do, and asked appellant (himself a member of the board) to attend the meeting and take care of his own bid.   Thereupon, the appellant increased his bid to $30,000.

It is true that Jordan testified that Niven told him on Saturday morning that appellant had offered $29,000, and that he thereupon informed Niven that appellant had offered him $30,000.   It is quite immaterial as to which of these witnesses was correct, but it occurs to us that the testimony of Niven was more reasonable; that is, that he was not informed that appellant was the man who had offered Jordan the $30,000.   For immediately after he was informed that there was a bid of $30,000, Niven went back to the appellant and informed him of that fact in order that appellant might increase his bid, if he wanted the property.   It was the duty of Niven and of Jordan, representing the appellee, to get the best price possible for the property, and if, without taking any undue or unfair advantage of the appellant, he was induced to bid $30,000 for the property, he should not be allowed to repudiate his contract to purchase for that sum simply because he ascertained afterward that he might have obtained the property for $29,000, if Niven had not understood from Jordan that there was a better bid and so informed appellant.   Niven states that he was perfectly innocent in this transaction, and we are disposed to believe him.   Since he thought he was the innocent cause of appellant's raising his bid, we can readily understand how he was anxious for the board to accept appellant's bid of $29,000.   But the board was not willing to do this, and it was justified in not doing it, because, according to the testimony of Jordan, appellant had before expressed a willingness to buy the property for $30,000.

Such being the case, Niven, not knowing that it was the bid of appellant himself and honestly believing that it was the bid of some one else, did not misrepresent a fact when he informed appellant that there had been a better bid.   Appellant himself, according to the testimony of Jordan, had made a better bid.   We do not see that the board was at fault in this transaction or that the appellant has the right to complain of it for the reason that he was invited by Niven who gave him the information to be present at the meeting and take care of his own bid, which he failed to do.   It occurs to us, under the circumstances, that when appellant increased his bid from $29,000 to $30,000 he was willing to pay that price for the property, and that no imposition whatever was practiced upon him.   It is clear that the property was worth around that figure, and the price he agreed to pay therefor was not excessive or oppressive.   So far as any misrepresentation concerning the personal property is concerned, the decided preponderance of the evidence shows that nothing was said by Niven or Jordan that was untrue in fact, and nothing concrning the occurred that was calculated to deceive or mislead appellant.

We conclude, therefore, that, upon the making and tendering by appellee to appellant of a warranty deed conveying perfect title to appellant, he should be required to fulfill his contract.

The decree of the chancery court so holding is correct, and it is therefore in all things affirmed.