[No. 8575. Department One. May 18, 1910.]

CLARENCE CUNNINGHAM, *Respondent*, v. INDEPENDENCE
CONSOLIDATED MINING COMPANY, LIMITED, *et al.*,
*Appellants.*[1]

CORPORATIONS — STOCK — SUBSCRIPTIONS—CONSTRUCTION—FREE OF ASSESSMENT. An agreement that a stockholder was to receive 100,000 shares of stock "free of assessment" until stock held by other stockholders had been paid for in full, does not mean "free from any charge or payment" so as to relieve the stockholder from paying for his stock in the first instance.

SAME—RIGHTS OF STOCKHOLDERS—ACTIONS—EQUITY. Equity will not give relief to a stockholder of a corporation, who, in bad faith made arrangements with a creditor whereby the corporation's property was subjected to execution sale, under an agreement whereby the same was to be redeemed and deeded to the stockholder, who

[1]Reported in 108 Pac. 956.

tried to defeat a redemption by the corporation when he might have paid the judgment or redeemed and held as equitable owner for the company.

SAME—LACHES. An action by one claiming stock in a corporation and for an accounting and equitable relief is barred by laches, where he was not diligent in the prosecution of his remedy for breach of the contract for his stock, but delayed seven years after knowledge of the breach, during which time he jeopardized the property of the corporation and subjected it to forced sale to the end that the title should come under his personal control.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered July 24, 1909, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action to establish rights as a stockholder in a corporation, for an accounting and other equitable relief. Reversed.

*Alex M. Winston* and *B. B. Adams*, for appellants.

*Wm. T. Stoll* and *C. P. Lund*, for respondent.

CHADWICK, J.—In the spring of 1898, plaintiff became interested in certain mining claims in the Coeur d'Alene country, Idaho. These he held under verbal or written options expiring September 10 of that year. With another he had done some little work on the claims and had made several unsuccessful efforts to interest capital, so that, on or about September 1, he sought defendant Kennedy J. Hanley, who went with him to look over the ground, and who thereupon agreed to furnish the money to take up the options, provided extra time could be arranged and the property on further investigation proved to be an attractive investment. New options were obtained by plaintiff in his own name, not only on the property then held by him, but upon some other ground adjoining. Between that time and March, 1899, Hanley expended considerable money in exploring and developing the property.

In March, 1899, a corporation, the Independence Consolidated Mining Company, Ltd., was organized. A board of

trustees was elected. This board selected defendant Hanley as president and plaintiff as secretary. The price of the stock was fixed at fifteen cents per share, and plaintiff was made selling agent. He also acted as general superintendent of the work at the mines, and received a salary of $150 per month. One hundred and fifty-two thousand shares of stock had been sold or subscribed under contract to pay upon call, up to September 1, 1899. On or about that date a meeting of the trustees was held, at which at least one of the stockholders was present, representing himself and some others who refused to carry out their contracts of purchase for the reason that the company did not have title to the property. Bad feeling had come between plaintiff and Hanley, and in consequence at that meeting the plaintiff resigned as secretary and another was elected. From that time the plaintiff took no active interest in the affairs of the company. Defendant Hanley assumed the active management of the company and, out of his own funds, paid the full amount due upon all the options, excepting the sum of either $500 or $750, and the balance of the purchase price of one claim which he deemed worthless. The whole sums so paid by him aggregated $47,200. In 1901 the company had become indebted to numerous creditors. A suit was brought by the Coeur d'Alene Hardware Company in its own behalf and as assignee of others. This suit was prosecuted to judgment. The several option agreements, together with their accompanying deeds, had been left at the First National Bank of Wallace. Plaintiff was named as grantee in all of these and, they not having been withdrawn and recorded, the company had no record title to its property. These facts being known to the hardware company, at its solicitation and upon the request of the creditors, who gave plaintiff the $500 or $750 necessary to cover the balance due on one of the claims, plaintiff took up the deeds, put them of record and then made a deed to the Independence company. Thereupon an exe-

cution was levied, and the property sold and bid in by the hardware company.

Prior to the transactions just noted, plaintiff had an understanding and agreement with the hardware company that, if the property was not redeemed by the Independence company, it would sell the claims to him for the amount of the judgment, interest, and costs. Plaintiff says that he intended to buy the property for the benefit of the company, but there is no evidence of this when considered in the light of the fact that a redemption would have accomplished the same purpose, leaving him in a position of a preferred equitable lien holder. Defendant Hanley had made unsuccessful attempts to raise the money to accomplish the redemption, and on the last day, he with another, who so far as the record shows was vice president of the company, went to Wallace and sought an extension of twenty-four hours. This was refused by the hardware company. Hanley and Argyle, the vice president, then arranged with Mr. August Paulsen for the money, but the sheriff, acting under the direction of the hardware company, refused to accept his certified check, demanding United States currency, and that alone. The amount necessary for redemption was finally gotten together, and received by the sheriff. Hanley as president, and the vice president acting as secretary, executed a deed to Paulsen under an agreement that, if the amount was repaid with eight per cent interest within six months, he would reconvey the property. Paulsen executed a deed to the company at the time and left it in escrow at the bank. Mr. Paulsen insisted upon this arrangement in order to avoid the complications of a mortgage and possible foreclosure. His attorney advised him that by so doing he took the absolute title subject only to his agreement to resell within a certain time at a certain price. The money was not paid to Paulsen within the time limited, and some time thereafter Hanley paid the full amount due, $13,505.92, being the amount advanced with

interest, and took a deed to the company. This deed was never recorded, and Hanley now claims it to be lost. The deed from the company to Paulsen was recorded June 14, 1904, and came to the actual notice of plaintiff within the ensuing year. Plaintiff claims that he then sought Argyle, who told him the deed was intended as a mortgage and that it was all done for the benefit of the company; that he and Argyle then went to the bank and examined the escrow agreement with Paulsen, but not the accompanying deed, it being sealed. This he says satisfied him. Argyle, who at the time his testimony was taken had no interest in the company, does not remember this circumstance.

In January, 1907, the Independence Lead Mines, Ltd., was organized, at the instance of and under the direction of the attorneys of third persons who had become interested in the property, and title passed to the Lead Mines company by deeds executed by Hanley, the Consolidated company, and Paulsen, Paulsen in the meantime having, at the request of Mr. Hanley, made another deed direct to him. No stock in the Consolidated company had ever been issued, but prior to the organization of the Lead Mines company, Hanley paid to all of the stockholders of the Consolidated company who had paid fifteen cents per share the full amount paid in by them, and became the owner of all the stock, or the right thereto, unless it be held that plaintiff is the owner of the amount claimed by him. The affairs of the Consolidated company were not carried on with any formality after September, 1899. Such books and records as there were were turned over by plaintiff to the new secretary elected at that meeting, and have been lost, as Hanley claims, or at any rate they were not before the court at the trial.

Plaintiff asserts an interest in the Consolidated company to the extent of one hundred thousand shares, or one-tenth of the whole capital stock, under an agreement made by Hanley at the September, 1899, meeting. In the absence of the minute books, he submits the following memorandum, which

he says is the original draft of the proposition made by Hanley and taken down by him as secretary at that time:

"I will protect all present subscribers to the extent of assessing 750,000 shares fully fifteen cents before any further assessments shall be levied against those of such subscribers who shall pay their full subscription to said stock; that is, fifteen cents per share, fully guaranteeing to carry free from all assessment or incumbrance 100,000 shares of said stock of Clarence Cunningham who shall not be assessed for said 100,000 shares until all the aforesaid 750,000 shares shall have paid into the treasury fully fifteen cents per share;"

it being plaintiff's claim that up to that time he and defendant were equal partners and had equal interest in the company; that they had subscribed for 500,000 shares of the stock, each 250,000, and that the balance was to be left in the treasury and sold for the benefit of the company; that the affairs of the company at that time being in bad shape, he proposed an agreement similar to the one he says Hanley made, but that because of Hanley's financial interest in the company the directors accepted the one made by Hanley.

It will be seen that the 750,000 shares, together with the 152,000 already sold, left approximately 100,000 shares unaccounted for. It is this stock that Cunningham claims as his own. On the other hand, Hanley insists that no such agreement was ever made; that the only interest he had in the meeting was to make the subscribers pay up or get out of the company; that plaintiff was never at any time interested other than as his agent; that he was paid a salary for all his services, and, while he was a trustee and officer of the company, it was understood that his interest was only nominal and sufficient to comply with the law in that respect.

Plaintiff does not give a very satisfactory explanation of these preliminary transactions. He says that he signed the subscription book of the company but, in answer to a question: "How much did you subscribe?" he says: "I don't remember." Although Hanley had, prior to the organization

of the company, advanced $5,250 as against his possible $1,000, in answer to the question: "Was it your understanding that he was to have credit for this amount of $5,250?" he says: "No, sir." The trial court found that plaintiff was entitled to one hundred thousand shares of Consolidated stock free of all charge, and appointed a receiver to take over the property. From this decree the defendants, other than Argyle and Newel, who had no interest in the result of the litigation, have appealed.

The testimony is so contradictory and so unsatisfactory, and respondent and appellant Hanley are so antagonistic, and as we believe, equally determined to get the advantage of the other, that we shall be governed as far as possible, as the trial judge evidently was, by the written evidence. The writing upon which respondent bottoms his case was construed as follows:

"At said meeting the defendant Hanley entered into an agreement with the Consolidated company and with the plaintiff by the terms of which he purchased from the company seven hundred and fifty thousand (750,000) shares of its capital stock at fifteen (15) cents per share, to be paid for in installments in such manner as to provide funds necessary to make all the payments due under the terms and conditions of the said options and to continue development work upon said mineral claims until the full amount of said purchase price of seven hundred and fifty thousand (750,000) shares should be paid into the treasury and expended upon said property; and also agreed to carry the plaintiff free from any charge or payment for one hundred thousand (100,000) shares of the capital stock of said company, which he, the plaintiff, then owned, until every other share in said corporation should have paid into the treasury the sum of fifteen (15) cents per share. A part of said agreement was that the plaintiff and defendant Hanley should donate to the treasury of the company sufficient of their individual stock to make up said seven hundred and fifty thousand (750,000) shares, which they accordingly did. Thereupon the defendant, the Consolidated company, by and through its Board of Trustees, caused said agreement to be entered upon

the books of the company, which books were then placed in the custody of the defendant Hanley, and have never since been in the custody or control of any other person or persons."

It will be noticed that the court gave to the words "free of assessment" the meaning "free from any charge or payment." The writing will not bear this construction. At best the words "shall not be assessed for" can only be held to be an agreement that respondent would not be called upon to pay any assessment upon, or any part of, the purchase price until Hanley had paid in full for the 750,000 shares. It so occurred to the court on the trial:

"The Court: My understanding is that he was not to pay anything until all the other stockholders had paid fifteen cents a share; then he would have to pay fifteen cents?"

to which respondent answered:

"No; I would meet the assessments after that as they were levied on the entire stock of the company; for instance, when the other stock had paid fifteen cents into the treasury of the company, then any further money required would be levied equally or assessed equally against all of the stock of the company, mine included."

He also says:

"Q. Was it the understanding that Mr. Hanley was to have any stock over and above this seven hundred and fifty thousand shares he was to buy at fifteen cents? A. No, sir. Q. In other words, there was not anybody to have any stock that they did not buy at fifteen cents; is that right? A. I was to have one hundred thousand shares. Q. Free? A. Under the terms of that agreement. Q. Free, without paying anything for it at any time? A. I considered I had paid something for it at some time. Q. Without paying anything into the company's treasury for it at any time? A. I had already paid in money, yes, sir. Q. And what was Hanley to have for what he had done prior to that time? A. There was no agreement that he was to have anything. Q. Wasn't he to have one hundred thousand shares of stock himself free? A. It was not so stated. Q. Isn't it a fact that he was to have

one hundred thousand shares of stock himself, the same as you? A. It is not."

The contract being denied, respondent does not show any equities that would entitle him as against Hanley to all of the remaining stock for nothing. He had been paid for his services while Hanley had put up every dollar that had gone into the property. It is extremely improbable that Hanley would agree to put up $125,000 as against respondent's nothing, and allow him to take free of all costs $15,000 worth of stock, and this at a time when they were in bad blood. If such was the intent of the parties, it would seem that common prudence would have dictated a more secure contract than that here offered.

Aside from these considerations, we are convinced that respondent should not recover for other reasons. There are none interested or contending for any interest in the Consolidated company other than respondent and Hanley, and admitting that Hanley got possession of the property in violation of his agreement, he did no more than respondent attempted to do. It can hardly be contended that, when he allowed the judgment creditors to pay $500 or $750 as the case may be for his personal account in order to release the deeds, and when he then recorded them, together with a deed from himself to the company, so as to permit an execution to be filed and a sale to occur under an agreement with the execution creditor that it would bid in the property and sell to him after the period of redemption, he acted in good faith. Especially so, when no demand was, or has since been, made on him for the money advanced to take up the deeds, and the creditors, in furtherance of that agreement, refused to extend the time for redemption even twenty-four hours, refused the check of Mr. Paulsen although certified, refused bank notes or anything other than legal tender under the Federal statute. It clearly shows collusion and intent to defeat the company. Good faith and the rights of the company demanded other conduct. Respondent could have, as a

stockholder, paid the judgment or redeemed and held as the equitable owner for the company, or he could have asked the appointment of a receiver and compelled a suit against Hanley to recover the balance due on the contract as he asserts it to be. He took the chance of appropriating the property of the company after the period of redemption had expired, and as against the present owners, should not be heard in a court of equity.

Equity bars recovery for another reason. Respondent has not been diligent in the prosecution of his remedy. His rights did not depend, as the lower court seems to have assumed, upon his finding out that the reconveyance from Paulsen was not for the benefit of the Consolidated company, but upon the contract which we have hereinbefore quoted. The time within which he should have acted began to run from the time notice of the breach of the contract was brought home to him. He knew as early as 1901 that Hanley had not paid for the 750,000 shares. Otherwise no judgment could have been taken against the company. He knew that Hanley, in violation of the agreement, had suffered the property to be jeopardized and subjected to forced sale. Then it was that he should have sought the courts. As we have said, he could, through the medium of a receiver, have compelled Hanley to furnish the money to take up these deeds and thus free the property. He did nothing, but suffered and assisted the further progress of events to the end that the title should come under his personal control. This action was begun in December, 1908. Considering all the circumstances, the character of the property, the lapse of time and conduct of the respondent, the equitable doctrine of laches intervenes. This doctrine is most frequently applied in mining cases, for the reason suggested in *Patterson v. Hewitt*, 195 U. S. 309:

"The defense of laches, which prompted the dismissal of the bill in this case, has so often been made the subject of discussion in this court that a citation of cases is quite unnecessary. Some degree of diligence in bringing suit is required under all systems of jurisprudence. In actions at law, the

question of diligence is determined by the words of the statute. If an action be brought the day before the statutory time expires, it will be sustained; if a day after, it will be defeated. In suits in equity the question is determined by the circumstances of each particular case. The statute of limitations consorts with the rigid principles of the common law, but is ill adapted to the flexible remedies of a court of equity. The statute frequently works great practical injustice—the doctrine of laches never. True, lapse of time is one of the chief ingredients, but there are others of almost equal importance. Change in the value of the property between the time the cause of action arose and the time the bill was filed; complainant's knowledge or ignorance of the facts constituting the cause of action, as well as his diligence in availing himself of the means of knowledge within his control, are all material to be considered upon the question whether the suit was brought with unreasonable delay. . . . It thus appears that the right of action accrued to the appellants in April, 1885, and that this suit was not begun until eight years thereafter—in 1893. Whether the refusal of Hewitt to make the deeds was right or wrong is not material here. There is no doubt from the findings that appellants had no share in the subsequent development of the mine or the discovery of the ore in 1890, and that it was through the efforts and perseverance of the defendants, and the aid they received from Ferguson, that they were put in possession of this valuable property. If appellants had expected a share in this property they should either have brought a bill promptly to enforce their rights, or at least contributed their proportionate share to the subsequent work and labor, and the expenses then incurred. To award them now a deed to their original interest in the property would be grossly unjust to the defendants, through whose exertions the value of. the property was discovered and the mine put upon a paying basis. While it is true the court might impose upon the appellants the payment of their proportionate share of labor and expenses as a condition of relief, it could not compensate the defendants for the risk assumed by them that their exertions would come to naught. There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which today may have no salable value may in a month become worth its millions. Years may be spent in working such property apparently to no purpose, when suddenly a

mass of rich ore may be discovered, from which an immense fortune is realized. Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced."

See, also, *Johnston v. Standard Min. Co.*, 148 U. S. 360; *Great Western Min. Co. v. Woodmas of Alston Min. Co.*, 14 Colo. 90, 23 Pac. 908; *Graff v. Portland Town & Mineral Co.*, 12 Colo. App. 106, 54 Pac. 854; *Rogers v. Van Nortwick*, 87 Wis. 414, 58 N. W. 757;

In *Ferrell v. Lord*, 43 Wash. 667, 86 Pac. 1060, this court said:

"There is no inflexible rule controlling the application of the defense of laches. The facts and circumstances of each case must govern courts of equity in permitting said defense to be made. The authorities show that, while lapse of time is one of the elements to be considered in applying this equitable defense to stale claims, it is only one, and that it is not necessarily the controlling or most important one. Regard must be had to all of the facts and surrounding circumstances, and if, when carefully considered, they do not appeal to the conscience of the chancellor, on behalf of a claimant, the defense of laches should be allowed."

This case falls within these rules, and for the reasons suggested, the judgment is reversed, with instructions to dismiss the bill.

RUDKIN, C. J., FULLERTON, GOSE, and MORRIS, JJ., concur.