[No. 9669. Department Two. July 19, 1912.]

M. C. GRAY et al., *Respondents*, v. C. H. REEVES et al.,
*Appellants*.[1]

FRAUD—FALSE REPRESENTATIONS—LIABILITY—INDUCEMENTS. There
is actionable fraud for which recovery may be had, where the de-
fendant induced the plaintiff to purchase mining stock relying on
the element of friendship, the defendant's experience as a mining
man, the promise of a certain fortune, and the false representations
that the stock was nonassessable and that the money paid would
be used for the development of the property.

CORPORATIONS—SALE OF STOCK—RESCISSION—FRAUD. The pur-
chaser of mining stock is entitled to rescind where it was repre-
sented that the same was treasury stock and that the money paid
was to be used in development, when in fact it was the personal
stock of the seller.

EQUITY—LACHES—STATUTE OF LIMITATIONS—MINING STOCK AND
PROPERTY. Laches will not prevent the recovery for fraud in the
sale of mining stock, where there is no element of estoppel or any
special circumstance rendering inequitable the prosecution of an
action within the time fixed by the statute of limitations; mining
stock not being within the rule that the doctrine of laches is pe-
culiarly applicable to mining property, when the corporation and its
property were not involved.

DAMAGES—INTEREST—FRAUD. Interest is recoverable as a meas-
ure of damages where money is wrongfully obtained by fraudulent
representations on the sale of stock which was of no value to the
purchaser.

Appeal from a judgment of the superior court for Spo-
kane county, Carey, J., entered March 3, 1911, in favor of
the plaintiffs, in an action for equitable relief, after a trial
on the merits before the court. Affirmed.

*Myron A. Folsom* (*John H. Wourms*, of counsel), for
appellants.

*Harry A. Rhodes* and *Moye Wicks*, for respondents.

[1]Reported in 125 Pac. 162.

CHADWICK, J.—On June 6, 1907, appellant C. H. Reeves sold to respondent M. C. Gray certain mining stock. Reeves for many years had been a practical mining man. He was a part owner in the Hercules mine, one of the famous silver-lead producers in the Coeur d'Alene mining district. His acquaintance with Mr. Gray dates from some time in the year 1904, when Mr. Gray sold him a horse. He was the president and a stockholder in the Sunrise Mining Company, a corporation organized under the laws of Idaho, and owning ground in the immediate vicinity of the Hercules mine. Mr. Gray was, at the time of the sale and for some time prior thereto, engaged in the business of breeding and importing fine horses. His place of business and residence was at Pullman, Washington. He had accumulated a comfortable fortune. Reeves and Gray became acquainted in 1904, as before stated, and they had become fast friends, Mr. Reeves on one occasion making Mr. Gray a present of a valuable cane as a token of his esteem.

Mr. Gray testifies—and in the main he is supported by other witnesses—that on or about June 3, 1907, Mr. Reeves went to Pullman with samples of ore which he claimed came out of the Sunrise mine; that he represented that the property had passed beyond the experimental stage; that it was in good milling ore, and was expected to make a mine of the character and value of the Hercules; that he told him of the fortunes he had made for the Days and Mr. Paulsen and Mr. Hutton by inducing them to come into the Hercules, and that because of his friendship for Mr. Gray he intended to give him the same chance; that he was the president of the company, and that the money Gray put in would be used for development purposes; that Gray and wife, who was present and participated in the transaction, relying solely upon their faith in Mr. Reeves and having no knowledge of mines or mining, were induced to purchase 50,000 shares of the stock at twenty-five cents per share, for which they paid

$10,000 in cash and gave a note for $2,500, which was paid one year after date.

The testimony offered on behalf of the respondents tends to establish the following facts: (1) That Mr. Reeves represented that the mine was sufficiently developed and had ore in quantities sufficient to insure its permanence and value; (2) that the stock was nonassessable; (3) that Reeves was selling treasury stock the proceeds of which would go for the development of the property; (4) that Reeves was getting no benefit in the way of personal profit out of the transaction; and (5) that, if respondents should become dissatisfied at any time, he would take the stock off their hands. The testimony of both sides shows that the mine is no more than a prospect, having no ore in commercial quantities in sight— "a good prospect but not a mine;" that the stock was assessable and, in fact, assessed; that Reeves sold·his own stock and at a considerable profit, and that no part of the purchase price went to the company; while upon the fifth issue the testimony of the appellant and one of his witnesses is to the effect that, while he did not promise to take the stock back, he did say that, if the Sunrise did not turn out to be a mine, he would give Mr. Gray an equal number of shares in other property.

The record is long and much detail might be recited, but it would be useless to do so; for we are satisfied that the testimony clearly preponderates in favor of the respondents. A point is made that Mr. Gray was a shrewd and successful business man and ought not to have been misled by promises that, when revealed in the courtroom, seem to be unreasonable. But in this appellants have overlooked an element which disarms caution; that is, friendship. It is the duty of a chancellor to put himself in the position of the parties and test their rights and obligations by the standards of conscience. The impulse that leads men to trust those in whom they have confidence cannot be ignored by the courts. Reputation for integrity or for knowledge of a given subject

would be worth nothing if its possessor could not assume that others would believe in him or accept his opinion. Hence, when men deal as friends and the one accepts that as true which but for the element of friendship would put a man upon inquiry, the law will protect him in his trust as certainly as it will deny him relief if the personal relations of the parties are such that the dealing is at arm's length. Although everything that would tend to show fraud in law is denied or qualified by explanation, we have here two men, the one an experienced mining man whose connection with a mine of sensational history had made him the envy of all who had not touched hands with luck; the other, shrewd and successful in the unemotional pursuit of trade, but utterly ignorant of mines and mining. The one makes his own career, rich samples of ore, a promise of certain fortune, and the assurance that the money paid was for the benefit of the property —or, in other words, to enhance the value of the actual money invested, inducements to the trade. To say that a man who is moved to part with his money under such circumstances is to be held at arm's length, is to deny sustenance to the very root of society; to make friendship a liability instead of an asset. The decree of the lower court is sustained by many decisions of this court. Most of them have been collected and may be referred to in *Blum v. Smith*, 66 Wash. 192, 119 Pac. 183. See, also, *Lindsay v. Davidson*, 57 Wash. 517, 107 Pac. 514; *Landis v. Wintermute*, 41 Wash. 673, 82 Pac. 100; *Daniel v. Glidden*, 38 Wash. 556, 80 Pac. 811; *Jones v. Hawk*, 64 Wash. 171, 116 Pac. 642; *Kohl v. Taylor*, 62 Wash. 678, 114 Pac. 874, 35 L. R. A. (N. S.) 174.

Moreover, it may be well questioned whether the minds of the parties ever met in the first place. Taking the case of appellants at its full worth, it may be that Mr. Gray was willing to make an investment in the property itself, to pay his money toward the development of the mine, or to make a business venture. In such cases, the law would hold him to his bargain. In this case it seems clear that Mr. Gray

had no intention of buying the personal stock of Mr. Reeves. He was not seeking a speculation, but an investment. We have no doubt that Mr. Reeves knew this to be so, and when he sold him his personal stock instead of the treasury stock of the company, he cannot complain if his adversary in the trade insists upon a rescission.

But it is said that respondents cannot recover under the doctrine of laches. The following cases are cited: *Upton v. Tribilcock*, 91 U. S. 45; *Cunningham v. Independence Consol. Min. Co.*, 58 Wash. 371, 108 Pac. 956; *Twin-Lick Oil Co. v. Marbury*, 91 U. S. 587; *Southern Development Co. v. Silva*, 125 U. S. 247. These cases adopt the theory that the doctrine of laches is peculiarly applicable where mining property is involved. The doctrine has been applied in such cases because the character of the property or the manner of its transfer, and all the incidents attending its use and ownership, are circumstances to be considered. But this is not a mining case. The subject-matter of the trade between the parties was indeed mining stock, but their rights and obligations in no way affect the mining corporation or its property. Where we have, as in this state, a general statute of limitations, the doctrine of laches is not applied *sua sponte*. Laches is akin to and governed by the same rules as estoppel. *Conaway v. Co-operative Homebuilders*, 65 Wash. 39, 117 Pac. 716.

Appellants also rely on *Romaine v. Excelsior Carbide & Gas Machine Co.*, 54 Wash. 41, 103 Pac. 32. That case is not in point. The action was there brought against the company, and it appeared that the rights of third parties had intervened. We have said that "unless there be some controlling equity, the court will not conjure the doctrine of laches to defeat or destroy a statute fixing a time within which actions may be brought." *Roger v. Whitham*, 56 Wash. 190, 105 Pac. 628, 134 Am. St. 1105. Nor will the doctrine avail where nothing is shown but the lapse of time. There must be some special circumstances disclosed in the

instant case which would render the prosecution of the suit inequitable.. *Cordiner v. Finch Inv. Co.*, 54 Wash. 574, 103 Pac. 829. It is not made to appear in this case that the rights of third parties have intervened or that the delay has misled appellants in any way.

It is complained that the court erred in allowing interest. *Landis v. Wintermute*, 40 Wash. 673, 82 Pac. 100, is cited, among other cases, as authority. Just why interest was not allowed in that case is not made clear. The allowance of interest, like the recovery itself, depends upon the equities of the case. If the character of the property be such that its use or occupation is of value while in the vendee's possession, interest will not ordinarily be allowed upon rescission; but where the recovery is allowed upon the ground of fraud or deceit, and the property sold is of no value to the vendee, if the consideration be money, interest will be allowed almost as a matter of course. Where money is wrongfully obtained, it is proper to allow interest as a measure of damages. 16 Am. & Eng. Ency. Law (2d ed.), 1012; *Doggett v. Emerson*, Fed. Case, No. 3,962; *Corse v. Minnesota Grain Co.*, 94 Minn. 331, 102 N. W. 728; *Perkins v. Rice*, Littell's Select Cases (Ky.) 218, 12 Am. Dec. 299. See, also, *Parks v. Elmore*, 59 Wash. 584, 110 Pac. 381.

Being convinced, as the trial court was, that the equities of this case lie with the respondents, we affirm the judgment of the lower court.

ELLIS, CROW, and MORRIS, JJ., concur.