[No. 31213.   Department Two.   June 8, 1950.]

DAVID H. SALTER *et al., Appellants,* v. RICHARD P. HEISER, *Respondent.*[1]

*Colvin & Williams* and *Max R. Nicolai,* for appellants.

*Elliott & Lee* and *Newman & Newman,* for respondent.

BEALS, J.—For some time prior to 1947, the defendant, Richard P. Heiser, was the owner of a tract of land, approximately forty acres in extent, in section 7, township 22 north,

[1]Reported in 219 P. (2d) 574.

range 6 east W. M., King county. The tract had been improved with a dance hall, a tavern, log cabins, picnic grounds, baseball field, tennis courts, and contained a lake suitable for boating and swimming. It had been operated as an amusement resort by Mr. Heiser.

The plaintiffs David H. and Blanche M. Salter (who will be herein referred to as Salter, Sr.) are the parents of plaintiff David H. Salter, Jr. (who will be referred to as Salter, Jr.), who, in the spring of 1947, was about twenty-one years of age and, some time previously, had been discharged from the United States marine corps, after thirty-two months of service therein.

Salter, Sr., was a sheet metal worker. He had been in the employ of the Boeing Airplane Company and, for a short time, had himself conducted a sheet metal shop.

Salter, Jr., had for a while worked with his father, and was entirely lacking in what might be termed business experience. He was, however, anxious to engage in some business and, early in 1947, visited the resort operated by Mr. Heiser, whom he met after looking over the premises. Mr. Heiser informed Salter, Jr., that he would be willing to rent the resort. Not long thereafter, Salter, Jr., again called on Mr. Heiser, who escorted him over the land, showing him the various buildings and the amusement devices situated thereon, and stating that he would lease the resort at a rental of four hundred dollars a month.

Salter, Jr., mentioned the matter to his parents, and, on several occasions during the months of February and March, 1947, he and his parents visited the resort, looking it over and estimating its possibilities, with a view to leasing it. None of the Salters had ever engaged in such a business, but the parents were anxious to help their son become established, and, finally, the three expressed their desire to lease the resort.

Mr. Heiser then instructed his attorney, Lee L. Newman, to prepare a lease for a period of ten months, commencing April 1, 1947, and ending January 31, 1948, at the rental of four hundred dollars a month, payable monthly in advance,

the lease to cover that portion of the land above described upon which were situated the buildings and resort facilities. Mr. Newman prepared a form of lease, which was handed to the Salters, who submitted the draft to their attorney, J. Elwood Peterson, who suggested several alterations. In the lease, the premises were described as "Shadow Lake Park Resort Picnic Grounds or Pla-Mor Picnic Grounds."

A substantial element of the resort property consisted of a tavern, in which a restaurant was operated, and beer was sold pursuant to a license issued by the state liquor control board. During the years 1945 and 1946, Mr. Heiser had leased the premises to one Roy R. Read, who had obtained, in his own name, a license authorizing him to sell beer in the tavern. About two months prior to April 1, 1947, Messrs. Read and Heiser had signed an agreement canceling the former's lease but permitting Read to keep the license.

The lease between Heiser and the Salters is lengthy, and was executed by the parties and acknowledged March 25, 1947, the term of the lease to commence April 1st following. The lessees entered into possession of the demised premises and commenced to operate the resort. They became dissatisfied with their bargain, and, September 16, 1947, filed their complaint in this action.

In their complaint, plaintiffs alleged that they were prevailed upon to sign the lease by misrepresentations made to them by defendant Heiser; that defendant, personally and by his agent, orally represented to plaintiffs that the premises were " 'free for a tavern license,' " and that plaintiffs, as lessees of the premises, had only to make a proper application for a license, the defendant well knowing that the license previously granted by the liquor board to Read would not expire until September 1, 1947, and that no new license would be issued for the premises while the former license was still in existence; that plaintiffs relied upon the representation made by defendant and his agent that a license could be procured for the operation of the tavern on the premises, and that "only in reliance upon said representation, did they enter into said Lease."

Plaintiffs alleged that, shortly after taking possession of the premises under the lease, they arranged to sublet the tavern (to one Simmons), and expended money in advertising the resort as "Pla-Mor Picnic, Dance Hall and Tavern" (a name which Read had used), but soon discovered that a liquor (beer and wine) license could not be procured therefor, because of the existence of the prior license issued to Read; that plaintiffs informed defendant of this situation, and he, personally and through his agent, stated that the matter would be adjusted with the liquor board, but that defendant failed to cause any license to be issued to plaintiffs; that, as a result of this misrepresentation by defendant, plaintiffs lost the value of their advertising of the dance hall and tavern and were unable to profitably operate the dance hall, as its patrons desired to purchase beer, and that they were unable to enforce their sublease of the tavern, as their lessee could procure no license to sell beer.

Plaintiffs also alleged that, prior to the making of the lease, defendant and his agent orally represented to them that the resort was known as "Shadow Lake Resort and Pla-Mor Picnic Grounds," and that this name was available to plaintiffs; that, upon entering into possession of the premises, plaintiffs discovered that they could not use the name "Pla-Mor Picnic Grounds," to their further damage; that, prior to the making of the lease, defendant and his agent orally represented to plaintiffs that the upper portion of the dance hall "was a hotel consisting of six rooms," which could be rented as hotel rooms and would be a profitable source of income to plaintiffs, when, at that time, defendant and his agent knew that the fire marshal had forbidden the use of these rooms for rent to casual guests, and that, upon taking possession of the premises, the fire marshal advised plaintiffs that the rooms could not be rented, to plaintiffs' further damage.

Plaintiffs then alleged that they had paid the rental called for by the lease but that, because of defendant's wrongful acts and misrepresentations, they had been deprived of the value of the use of the premises; that the summer season for

the resort had closed, and that the balance of the leasehold term was valueless.

Plaintiffs prayed for judgment against defendant for $18,100, asking that $1,600 which they had deposited as security for performance of the lease be returned to them, and that they be released from paying any further rental under the lease, also asking for further relief. By a trial amendment, plaintiffs increased their demand for damages to $21,036.

Defendant filed his answer to the complaint, denying the allegations thereof and affirmatively alleging the execution of the lease, and that he had "carried out each and every portion of the agreement in said lease contained," praying for the dismissal of the action. By a trial amendment to his answer, defendant alleged that, of the ten months' rental due according to the terms of the lease, plaintiffs had paid $2,400, leaving $1,600 unpaid, and prayed that the $1,600 on deposit as security for the performance of the lease be awarded to him. Plaintiffs replied by asking that the $1,600 be returned to them.

The action was tried to the court, sitting without a jury, the statement of facts containing over four hundred fifty pages of trial record. At the close of the case, the trial court orally reviewed the evidence, stating that the action would be dismissed. Plaintiffs' motion for judgment in their favor notwithstanding the oral decision of the court or, in the alternative, for a new trial having been denied, the court made findings of fact, followed by conclusions of law in favor of the defendant, and entered a judgment dismissing plaintiffs' complaint and awarding defendant judgment against plaintiffs for the sum of $1,600, and providing that the judgment be a lien against the deposit of $1,600 made by plaintiffs.

From this judgment, plaintiffs have appealed, making the following assignments of error:

"The trial court erred in:

"(1) Entry of Finding of Fact, Paragraph VII, stating that parties dealt at arms length and that evidence fails to show false representations of existing facts upon which

plaintiffs had a right to rely and that plaintiffs failed to suffer damages.

"(2)   Entry of Conclusions of Law, Nos. I, II, III, dismissing plaintiffs' complaint and allowing judgment in favor of defendant upon his cross-complaint.

"(3)   Entry of judgment dismissing plaintiffs' complaint and allowing judgment for the defendant.

"(4)   Failure to grant plaintiffs' motion for a judgment notwithstanding the oral decision of the court, or in the alternative, for a new trial, particularly on ground No. 7 of the motion alleging that the decision of the trial court is contrary to the evidence and to the law.

"(5)   Failure to enter judgment in plaintiffs' favor."

Two witnesses, besides respondent, testified on the latter's behalf, namely, Lee L. Newman, respondent's attorney, and Matthew K. Gaffney, who operated an amusement resort in King county, about nineteen miles from the city of Seattle.

The three appellants testified, calling as their witnesses J. E. Peterson (their attorney), Roy R. Read, and six others, including respondent Heiser as an adverse witness.

From the evidence contained in the record, it appears, beyond question, that appellants were entirely inexperienced in the business of operating an amusement resort. After the middle of March, 1947, the parties and their respective attorneys met at Mr. Newman's office, where the matter of a lease was discussed, Mr. Peterson raising several objections to the draft prepared by Mr. Newman. It is evident that appellants were of the opinion that their attorney was quite technical, as, under date of March 24, 1947, Mr. Peterson wrote Salter, Sr., a letter in which he noted at considerable length his objections to the lease which Mr. Newman had prepared, and warned appellants that the proposed lease contained provisions which, in the opinion of the writer, were unfair, and that, if appellants signed the lease proposed by Mr. Newman, they might experience difficulties which would result to their serious prejudice. We quote from this letter the following:

"It is to be borne in mind that if you are so anxious to have that property that you will take it with any kind of a lease regardless of its terms, then there is nothing further

to be said and it is possible that you will get by without any trouble but having consulted me about it and knowing that you look to me to point out the dangers as far as we can anticipate them, I must call your attention to these matters.

"Having pointed out the dangers, I can go no farther in protecting your interests unless you make up your mind to either accept the dangerous policies or insist on a fair lease but I refuse to assume further responsibility than to point out and then you can choose it if you want to."

While this letter does not call attention to any matters with which we are here concerned, it clearly indicates Mr. Peterson's belief that appellants were so anxious to lease the property in question that, notwithstanding their entire inexperience in such a business operation (or because of that inexperience), they were disposed to enter into the lease without considering the seriousness of the undertaking.

From the evidence, it appears that appellant Salter, Sr., respondent, and his attorney, Mr. Newman, were all members of the same secret fraternal order, and that, for this reason, appellants felt that they could rely upon statements made by respondent and his counsel, and that no advantage would be taken of appellants.

Respondent contends that this was an entirely immaterial matter, and that the parties at all times were dealing at arm's length. This contention is not supported by the evidence. From the record, we are convinced that the fact that the three persons mentioned were members of the same fraternal order, to respondent's knowledge and that of his attorney, caused appellants to rely to a greater extent than usual upon statements made by respondent and his counsel.

By a written agreement between Read and Heiser (acknowledged by respondent in California, February 1, 1947), the lease to Read, *supra,* was canceled several weeks prior to the execution of the lease to appellants. The agreement of cancellation, which was introduced in evidence, contains the following:

"WHEREAS, the beer license issued to the said lessee, Roy Read, is being taken by the said Roy Read, who maintains

that he has the property right and interest in this said license; now, therefore, . . . "

Appellants introduced testimony to the effect that the right to sell beer at the tavern pursuant to a liquor license issued by the state liquor board, was necessary to a successful operation of the tavern. Testimony to the contrary was introduced by respondent. It appeared, from the testimony introduced on behalf of appellants, that they were not aware of the agreement between respondent and Read providing that Read should maintain, as his property, the liquor license which had been issued to him.

Mr. Peterson testified that respondent and his counsel stated, in the presence of the witness, that there had been trouble between respondent and Read; that Read had "picked up and left"; that he had "skipped out," and that his whereabouts was unknown. Mr. Peterson then testified that he advised his clients to talk to Read, if he could be found. Salter, Sr., also testified that he was not advised that Read then owned the tavern license, and that he could obtain no information as to Read's whereabouts.

Appellants had arranged for Charles E. Simmons and his sister and brother-in-law, Mr. and Mrs. Charles H. Garrett, to sublease the tavern from appellants. Mr. Simmons testified that respondent told him that there was nothing to prevent his procuring a license to sell beer at the tavern, and did not inform him that Read had maintained his ownership of the license when Read's lease was canceled.

Respondent was called by appellants as an adverse witness, and testified that Mr. Simmons had talked with him concerning "a tavern license," prior to subleasing the tavern from appellants. We quote from respondent's testimony:

"Q. Did you tell him at that time that Roy Read had taken the tavern license with him, all that? A. I told him that Roy Read took it. Q. You told Mr. Simmons? A. If he asked me that I would have told him that. Q. Did you tell him or didn't you? A. That is— MR. ELLIOTT: He answered it."

Later, respondent testified on his own behalf, stating that he was in California when Read "left the property," but

that, as Read had testified, respondent met him, probably in February or March, 1947, at Renton. On cross-examination, respondent testified that, at some time during the negotiations with appellants, the matter of the beer license was discussed, and that he had stated to appellants that "Mr. Read took it." Respondent also testified that, when appellants asked him where Read was, he told them that Read was somewhere in the neighborhood; that he was aware of the fact that appellants were endeavoring to locate Read, and that, while respondent "didn't know the name of the place that he had moved to, [it] was over there somewhere close, I could have found out if I had wanted to." Respondent further testified that he also was aware of the fact that he and Salter, Sr., were members of the same secret fraternal order.

Mr. Read, called as a witness by appellants, testified that, during the months of February and March, 1947, while the negotiations between appellants and respondent were being conducted, he was living less than two miles from respondent's establishment; that his whereabouts during this period was a matter of common knowledge around Shadow lake, and that respondent's employees knew where he was. Mr. Read testified that he had returned his license to the liquor board when he ceased to operate the tavern at Shadow lake. Evidently, this meant no more than a deposit of the license with the liquor board until he should apply for a new license at another location, or the license should be surrendered or expire. It clearly appears that, so far as the liquor board was concerned, the license was still effective in Read's favor. Read also testified that he applied for leave to operate under the liquor license at two different locations but, in each instance, his request was refused by the board. It appears that the state liquor board will issue only a restricted number of licenses in a certain locality, and that, Read's license still being effective for the place for which it was issued, he would have had a preference, under that license, for the opening of a tavern in the same vicinity. In any event, it appears, beyond question, that Simmons' application for a

license was refused by the board because of the fact that Read's license was still in effect.

During the negotiations which led up to the signing of the lease, appellants met respondent on at least two occasions in Mr. Newman's office, Mr. Newman being present, where matters concerning the lease were discussed. Mr. Peterson was present at one of these meetings and possibly, for a time at least, at both.

Concerning the procuring of a liquor license for the tavern by appellants, Salter, Sr., testified that respondent had stated that Read "had left the country, he didn't know where he went," and that "the place was free and clear to obtain a license." The witness testified that Mr. Newman also "said it was free and clear, all I had to do was to go down and get it." The witness further testified that he knew nothing concerning the business of operating a tavern, and did not inquire about regulations promulgated by the liquor control board.

Salter, Jr., testified to the same effect, stating that respondent had said that appellants could procure a license upon applying and paying the necessary fee, and that appellants accepted that statement as true.

Mr. Peterson testified as to what was said at one of these meetings, as follows:

"I said 'Is there anything in the way of or doubt of the new tenant, or their sublessee, from getting a license in there?' I explained that we had this sublease there to some sublessee and it had been agreed that we could. And then I said 'Before I draw it I want to know is there anything in the way of our getting a license.' I asked if there had been anything brought against his operation of Shadow Lake or Pla-Mor Picnic Grounds before to prevent them from getting it. And he said there was none. I said 'Is there anything else?' And he said 'There is not. It is wide open. All you have to do is to apply for it. There is nothing in the way. I can assure you of that.' Q. Who assured you of that? A. Mr. Newman and Mr. Heiser who was sitting facing to me also stated so. . . .

"Q. I am speaking of the conversation with Mr. Newman and Mr. Heiser, those ones, their questions and their an-

swers is all. A. I asked Mr. Newman and Mr. Heiser whether there was anything that would prevent their being able to get a liquor—a beer or liquor license at this Shadow Lake Park. And I explained to them that, without such a license and unless we could sublet this particular park to another party to run it and to run the restaurant, they were not interested in the transaction at all. They assured me that there was none. I asked, repeated the question, I asked Mr. Heiser and I stated to Mr. Newman, 'I want to know. I don't doubt your word, but I want to know whether my client understood it the same as you did.' And he said 'There is nothing. All that you have to do is go and put in your application and get your license.' . . . I told him then that if he would assure us on those matters as being of his personal knowledge, I would trust him on them. I have known Mr. Newman for many years, and I told him so, that I would take his word for it, if he made a statement as a statement of fact. That is very briefly the discussion that lasted for at least a half an hour. I didn't repeat it word for word. It would be impossible."

The witness further testified that Mr. Newman had stated that "unless there was a definite ground against you, or something of that kind, or some black mark against the park, you could get a new license, all you had to do was to apply for it," and that the witness believed Mr. Newman's statement, testifying: "I trusted Lee Newman on it. They were all the time rushing to close this deal. They were pressing me right along."

Mr. Peterson also testified that Mr. Newman mentioned the name of a friend of his who was a member of the liquor board, and stated that he could go down and see this friend "and get a license."

In respondent's brief, this portion of the testimony of the witness is brushed aside with the statement that any reference to any anticipated influence which Newman might have had with any member of the liquor board could not be

". . . taken as anything more than 'puffing.' Perhaps if a vendor may 'puff' his wares without being chargeable with fraud, an attorney may likewise be pardoned for indulging somewhat in the same pastime."

Mr. Peterson testified that he found a telephone message in his office advising him that the lease would be signed at a certain time on a day specified, but that he had heard no more about the matter and did not attend.

When Mr. Simmons applied to the liquor board for a license for the tavern in question, and his request was refused because the license issued to Read was still outstanding, respondent and Mr. Newman voluntarily aided Mr. Simmons, appearing with him before the board at a second hearing, at which Mr. Read contested the granting of a license to Mr. Simmons. When his request for a license was again refused, Simmons and Salter, Jr., called at Mr. Newman's office and discussed the matter with him. Salter, Jr., testified as follows concerning the conversation with Mr. Newman on this occasion:

"Q. Tell the substance of what he said? A. He kind of brought something up that he figured it would be kind of hard to get a license. He figured as he put it, it was kind of hard to get a license. Q. Did he say why he figured that way? A. I brought that right in, I said, 'Then you knew all along that there wasn't a license in the place.' Q. What did he say to that? A. He said, 'When I am negotiating a lease I don't tell everything I know.' Q. Up to that time had he ever indicated that there was any doubt in his mind about the license being obtained for the operation of the tavern? A. Not to my knowledge, sir."

Concerning the same conversation, Mr. Simmons testified as follows:

"Q. Tell what was said by Davie [Salter, Jr.] or yourself to Mr. Newman at that time about the license? A. We had a little controversy at that time. I think Davie was quite put out about the license, particularly as it appeared that Mr. Newman seemed that he thought, that he knew all the time that we could not get a license. Q. What did Mr. Newman say, if anything, about it? A. He said, 'You don't tell everything that you know when you are closing or negotiating a lease.' "

Respondent and Mr. Newman both testified emphatically that neither of them had ever stated to appellants or to Mr. Peterson that the premises were "free and clear for a liquor

license" or that all appellants had to do was to file their application and receive a license, and that neither of them ever used language of similar tenor. Both witnesses testified that appellants never asked about the license.

In its oral opinion at the close of this case, the trial court said:

"This judge would not be a human being if he was not sympathetic with these people. I am impressed that they are good citizens, and I am impressed with the fact that these people testified honestly here. I recognized that they were sincere in their belief that they were overreached here."

The trial court did not state which witnesses it believed in connection with the phase of the testimony concerning the license, but did make the following statement:

"The first instance on which I will comment, the first pleaded, is the most important. That is the question of the tavern license. If the plaintiffs are to sustain their allegations on this point, they must establish that with reference to the license there was misrepresentation, the first misrepresentation of fact upon which they rely. Now the evidence of the plaintiffs is that the defendant and his agent stated that the premises were free and clear for license. It is my opinion that that statement did not constitute a misrepresentation of fact. The plaintiffs knew that it was necessary to have a tavern license in order to operate a tavern. They understood that somebody else had had the license. They are presumed to know that the granting of a license to operate such a place of business is discretionary with one of the administrative branches of the government. . . . And under the evidence in this case I believe that the only conclusion that can be reached is that the statement that the place was free and clear for license was technically true."

The trial court observed that:

"In as far as the record in this case goes on that point and the evidence which is before me the license sought for might still be granted to Mr. and Mrs. Salter, or to any one of them that might apply for it at this time, because it is my understanding of the evidence that Roy Read has finally got a license and liquor permit for some place some ten miles away from this scene I believe the evidence is, and it may

well be that the liquor board might now say 'Yes, the license may be granted.'

"Of course, the plaintiff feels very badly in this case because all he did was to speak to Mr. Heiser and his attorney on that. But I will not comment on that because it is not necessary under the view of the law as I take it for me to make comment.

"My finding is, as I have already suggested, that this statement was not such a fraudulent misrepresentation of fact as would justify the relief on the point which the plaintiffs claim."

The court then commented upon the fact that appellants were advised by able counsel, and that the "parties were as is asserted dealing at arms' length at the time of the negotiation of this lease," concluding his review of this portion of the case by saying:

"So I do believe that under the evidence I cannot find that the plaintiffs could successfully assert that when they entered into this transaction they would be entitled to rely upon Mr. Newman's statements at one of these conferences."

■ In the recent case of *Dixon v. MacGillivray*, 29 Wn. (2d) 30, 185 P. (2d) 109, this court, in affirming a judgment in favor of the plaintiff in an action based upon fraudulent representations by a real-estate agent, said:

"In *Webster v. Romano Engineering Corp.*, 178 Wash. 118, 34 P. (2d) 428, followed by *Andrews v. Standard Lbr. Co.*, 2 Wn. (2d) 294, 97 P. (2d) 1062, we stated that we were reluctant to define fraud, but that, along with all other courts, we recognized certain essential elements that enter into its composition. We said:

" 'These are: (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage.' "

In the case at bar, appellants' evidence brings this case within the above rule.

In the case of *Voellmeck v. Harding*, 166 Wash. 93, 6 P. (2d) 373, 84 A. L. R. 608, an action based on fraud and deceit

through false representations; this court held that the relationship which existed between the plaintiff and the defendant was of such a nature that the former had a right to rely upon representations made to him by the latter. The case was tried to a jury, and a judgment entered upon the verdict in favor of the plaintiff was affirmed. In the course of the opinion, we quoted from the case of *Zimmerman v. Bitner*, 79 Md. 115, 28 Atl. 820, the following:

" 'A good deal has been said as to what constitutes a *confidential relation* within the operation of the principle, but Courts have always been careful not to fetter the operation of the principle by undertaking to define its precise limits. The cases of parent and child, guardian and ward, trustee and *cestui que trust*, principal and agent, are familiar instances in which the principle applies in its strictest sense. But its operation is not confined to the dealings and transactions between parties standing in these relations, but extends to all relations in which confidence is reposed, and in which dominion and influence resulting from such confidence, may be exercised by one person over another. No part of the jurisdiction of the Court is more useful, it has been said, than that which it exercises in watching and controlling transactions between parties standing in a relation of confidence to each other. And being founded on the principle of correcting abuses of confidence, it ought to be applied to every case in which a confidential relation exists as a fact—where confidence is reposed on one side, and the resulting superiority and influence on the other.' "

In the case of *Tacoma v. Tacoma Light & Water Co.*, 17 Wash. 458, 50 Pac. 55, this court affirmed a judgment in favor of the plaintiff, based upon fraud and deceit on the part of agents of the defendant in connection with the sale of a water and light plant to the plaintiff. In the course of the opinion, the court quoted from Bigelow on Fraud, p. 524, as follows:

" 'If the representation were of a character to induce action, and did induce it, that is enough. It matters not, it has well been declared, that a person misled may be said, in some loose sense, to have been negligent (in reality negligence is beside the case where the misrepresentation was calculated to mislead and did mislead); for it is not just that a man who has deceived another should be permitted to say

to him, "You ought not to have believed or trusted me," or "You were yourself guilty of negligence." This indeed appears to be true even of cases in which the injured party had in fact made a partial examination.' "

In *Gray v. Reeves,* 69 Wash. 374, 125 Pac. 162, an action for equitable relief, based upon fraud, this court, in an opinion written by Chadwick, J., said:

"A point is made that Mr. Gray was a shrewd and successful business man and ought not to have been misled by promises that, when revealed in the courtroom, seem to be unreasonable. But in this appellants have overlooked an element which disarms caution; that is, friendship. It is the duty of a chancellor to put himself in the position of the parties and test their rights and obligations by the standards of conscience. The impulse that leads men to trust those in whom they have confidence cannot be ignored by the courts. Reputation for integrity or for knowledge of a given subject would be worth nothing if its possessor could not assume that others would believe in him or accept his opinion. Hence, when men deal as friends and the one accepts that as true which but for the element of friendship would put a man upon inquiry, the law will protect him in his trust as certainly as it will deny him relief if the personal relations of the parties are such that the dealing is at arm's length."

In the case of *Schweickhardt v. Chessen,* 329 Ill. 637, 649, 161 N. E. 118, the court said:

"A fiduciary relation is not limited to cases of trustee and *cestui que trust,* guardian and ward, attorney and client, or other recognized legal relations, but it exists in all cases where confidence is reposed on the one side and a resulting superiority and influence on the other side arises therefrom. *The origin of the confidence is immaterial. It may be moral, social, domestic or merely personal.*" (Italics ours.)

In the case of *Palladine v. Imperial Valley Farm Lands Ass'n,* 65 Cal. App. 727, 225 Pac. 291, which was an action to recover damages for fraudulent representations made in connection with the sale of land, certain of the defendants appealed from a judgment in favor of the plaintiffs. From the opinion, it appears that the plaintiffs, husband and wife, had purchased a tract of land from the defendant association. In the course of the opinion, the court said:

"The fact that plaintiff drove on to the land and saw it prior to purchasing it does not necessarily charge him with knowledge of the facts, or establish that he relied upon his own judgment, or debar him from claiming that he relied solely upon the representations made to him. The fact that a vendee visits the property does not necessarily preclude him from saying that he relied upon his vendor's statements. [Citing cases.]"

One Clark, who was an agent of the defendant association, went with the plaintiff husband to examine the land in which the latter was interested. Referring to this trip, the court said:

"There was that in the relations of these two men, Clark and A. C. Palladine, which was calculated to disarm caution. It seems that in the course of the trip and prior to the party's arrival at section 13 plaintiff discovered that he and Clark were members of the same secret order. Plaintiff testified that some time after he and Clark had made themselves known to each other as brothers in the same fraternal organization, and after the party had arrived at section 13 but prior to the closing of the deal, the following conversation occurred: Plaintiff, addressing Clark, said: 'Mr. Clark, I am helpless [referring, doubtless, to his purblindness and to his unfamiliarity with the conditions in that part of the state]. I will charge you for myself. Will you advise me as a gentleman and a Mason if this land grows grapes, fruit, cotton, alfalfa, etc.?' To this Clark replied: 'Certainly, this land will grow grapes, fruit, some other things and cantaloupes, and will grow anything that will grow outside of doors.' Thereupon plaintiff asked Clark if the soil was good, to which Clark replied: 'It is all sandy loam of great fertility and rich.' One of plaintiff's sons testified that his father said to Clark: 'Mr. Clark, if all the representations that you make of this place is true, and you give me your word as a Mason that they are true, I will take this section of land'; and that to this Clark replied that his representations were true and that the land was even better than he had represented it to be. Thereupon the deal was closed. It is due to Mr. Clark to say that these conversations are denied by him; but though his testimony in many particulars is corroborated by that of disinterested witnesses in the case, the jury chose to believe plaintiff and his witnesses, and we, perforce, must accept the testimony of the latter as true for all the purposes of this appeal.

"If the testimony of plaintiff be true, Clark took advantage of their fraternal relation and of the confidence which plaintiff reposed in him by reason of that relation. Though they had never met before that day, plaintiff's discovery that he and Clark were members of the same fraternal order was well calculated to inspire him with the same confiding trustfulness which one intimate friend may safely repose in another. It has been held that when men deal as friends, and one accepts as true false representations by the other, into which, but for the relation of friendship, he would have made inquiry, the law will protect him in his trust as certainly as it will deny him relief if the personal relations of the parties are such that the dealing is at arm's-length. (*Gray v. Reeves*, 69 Wash. 374 [125 Pac. 162]. See, also, *Dorr v. Cory,* 108 Iowa, 725 [78 N. W. 682], and *Grant v. Ledwidge*, 109 Ark. 297 [160 S. W. 200].) For reasons equally cogent it must be held that when two men deal with each other as members of the same fraternal order, and one accepts as true the representations of the other, into which but for the fraternal relation he would have made inquiry, the law will protect him in his trust."

The judgment appealed from was reversed because of error committed by the trial court in connection with the introduction of evidence not pertinent to the matter above discussed.

In *Lucas v. Associacao Protectora Uniao Madeirense Do Estado Da California*, 61 Cal. App. (2d) 344, 143 P. (2d) 53, which was an action brought by the plaintiff against a "social, beneficial and benevolent fraternal organization," of which she was a member, and against its directors and several of its members, the appellate court affirmed a judgment in favor of the plaintiff. As stated by the court:

"One basic question is presented, namely, whether appellant's knowledge of the situation was such that the trial court was justified under the law in holding that appellant took the property in trust for respondent [the plaintiff]."

In the course of the opinion, the court said:

"The court found that there was a relationship of trust and confidence between the lodge and respondent. This finding is clearly supported by the evidence. In *Palladine v. Imperial Valley F. L. Assn.*, 65 Cal. App. 727, at p. 745 [225 P. 291], it is stated: 'For reasons equally cogent it

must be held that when two men deal with each other as members of the same fraternal order, and one accepts as true the representations of the other, into which but for the fraternal relation he would have made inquiry, the law will protect him in his trust.' Appellant claims the above quoted portion of the opinion is dictum and is not sound in any event. With these contentions we cannot agree. The quoted rule is particularly applicable to the facts of the present case because the record demonstrates that respondent as a fact placed confidence in the lodge and its attorney, and that without such trust and confidence the agreement here involved would not have been made."

Appellant's petition for a hearing before the supreme court of California was denied.

In the case at bar, respondent cites many cases, which we have examined, but we are convinced that the authorities above cited are here controlling.

The court, in its oral summation of the evidence, expressed the opinion that appellants had "testified honestly here." The court further said that statements by respondent or his agent to the effect that the premises were free and clear for a license did not constitute a misrepresentation of fact, and that appellants understood that Read had had a license. The court concluded that, under the evidence, any statement to the effect that the place was free and clear for a license was "technically true." Of course, at the time appellants leased the premises, the tavern was not being operated pursuant to a license or otherwise, but, as it afterward transpired, the liquor board refused to grant appellants a license to operate the tavern because Read's license was still outstanding. To appellants, the representation that the tavern was free and clear for a license would mean only that they could procure a license to operate it.

The trial court erred in its estimate of the situation as to appellants' claim for damages in connection with representations made to them concerning the liquor license.

Because of the desire of Salter, Jr., to undertake the operation of the amusement park, coupled with other matters hereinabove discussed, and in spite of their complete ignorance concerning the business in question and business in

general, appellants, without investigation of relevant and important matters, signed the lease. In so doing, to the knowledge of respondent and his counsel, appellants relied upon statements made to them which, in some instances at least, did not accurately portray the true situation.

From the record before us, it clearly appears that, for the reasons above stated, the parties were not dealing at arm's length; that appellants relied upon statements made by respondent and his attorney which were inaccurate and misleading, and that appellants were thereby prejudiced.

Appellants also contend that the trial court erred in ruling that they were not entitled to damages, because their lease referred to the property as "Shadow Lake Park Resort Picnic Grounds or Pla-Mor Picnic Grounds," and, early in May, appellants received a letter from Read informing them that "the trade name PLA-MOR is a personal property owned and registered by Roy R. Read," the letter further stating that the writer intended to use the name again in the same locality and threatened suit unless appellants ceased using the name. When appellants took possession of the property, there was a large "Pla-Mor" sign thereon, and other signs on the roads leading to the resort. Upon receipt of Read's letter, appellants discontinued using the name "Pla-Mor," spending considerable money in the preparation of new signs.

In its memorandum decision, the trial court referred to this phase of the case as follows:

"As far as this record is concerned, there is nothing in the nature of a suggestion that legally the plaintiffs [appellants] could not have gone on and used the name Pla-Mor in spite of this letter from Mr. Read."

The record does not support an allowance of damages to appellants in connection with this phase of the case. So far as the record shows, it does not definitely appear that appellants did not have the right to use the name "Pla-Mor," and they are not entitled to recover damages against respondent in connection with this phase of the litigation.

Appellants also contend that they are entitled to damages, because respondent told them that there were eight (six as alleged in the complaint) rooms in one of the buildings which could be rented as hotel rooms, when, as a matter of fact, the King county fire marshal had forbidden the renting of these rooms to casual guests, although they could be used by the owners of the premises or their employees.

It does appear that respondent was not altogether candid in statements he made to appellants concerning these rooms, as respondent knew that the fire marshal had forbidden the renting of the rooms until certain alterations were made, yet he represented to appellants Salter that the rooms could be so rented, and practically admitted that he told an associate of appellants that the rooms could be rented as hotel rooms, stating:

"Yes, I may have told her that. That I couldn't recollect. I never told them [appellants] that they couldn't rent them, never told them that."

Appellants testified that they intended to rent only four of the eight rooms, and the evidence is insufficient to support a judgment for damages on this account, as the record contains no evidence that, while appellants were in possession of the premises, the rooms could have been rented or, if so, at what profit to appellants.

The judgment appealed from is reversed, and the cause remanded to the superior court, with instructions to reopen the case and grant a new trial upon appellants' claim for damages against respondent based upon misrepresentations in connection with the matter of the procurement by appellants of a license authorizing the sale of beer in the tavern. The case, as to this issue, will be reheard upon the record already made before the superior court and such further evidence as may be introduced, the court being authorized to reopen the case upon a proper showing, on motion of either party to the action.

After a retrial upon the issue above mentioned, the court will enter an appropriate judgment based upon the record, as upon a trial *de novo,* save that no damages are to be allowed appellants on their claim in connection with the

alleged denial of their right to use the name "Pla-Mor," or on their claim based upon their alleged inability to rent rooms in the building referred to in their complaint. Any other issues presented by the pleadings of the respective parties are to be determined by the trial court, after the court has reached a decision in connection with appellants' claim for damages based upon their failure to procure a liquor license.

SIMPSON, C. J., ROBINSON, MALLERY, and HAMLEY, JJ., concur.